[Civ. No. 8637.   Third Dist.   June 23, 1955.]

ALBERT GOODWIN, Respondent, v. W. L. BRADEN et al., Appellants.

Maurice H. Roach and Sea & Hanna for Appellants.

Hewitt & McBride for Respondent.

SCHOTTKY, J.—Plaintiff commenced an action against defendants to recover damages for the partial loss of a growing crop of milo corn caused by the alleged negligent flooding by defendants of land leased by plaintiff. Defendants denied any negligence on their part and also pleaded the defenses of contributory negligence and unavoidable accident. The jury rendered a verdict in favor of plaintiff in the sum of $4,132.86, and defendants have appealed from the judgment entered on said verdict.

Before discussing the contentions urged by appellants for a reversal of the judgment we shall summarize the factual situation, as shown by the record.

From 1948 through 1952 plaintiff leased and farmed certain land in Sutter County in what is known as the Sutter By-Pass. The lease provided, among other things, that lessor should get one-fourth of the milo corn crop as rent and that plaintiff should bear all expenses of farming.

Plaintiff's land was bounded on the south and southwest by lands leased for a gun club. To the west was another gun club known as the Haley Club. To the east of plaintiff's land was a borrow pit, created by excavation of material to construct the original levees on the by-pass, and which was apparently a body of water existing the year around. Somewhere to the west of defendants' land and adjoining it, and apparently south and west of the Haley land, was the west borrow pit, also a year around existing body of water. The west borrow pit received run-off water from plaintiff's land which drained roughly south and west through the lands of the two gun clubs, and it also received both percolating and surface waters draining from the rice fields of Sutter County to the northeast. Within the west borrow pit the natural flow of the water was generally southerly.

Plaintiff obtained irrigation water from the east borrow pit and by a series of checks or small levees of about 18 to 20 inches in height controlled its flow through his crops until it reached the common boundaries with the Haley and

Zipper lands. These boundaries were marked by the same type and sized levees, and plaintiff allowed the surplus irrigation water to drain from his fields through several openings made in these levees for that purpose.

Defendants had for a number of years obtained water to flood their land to provide a feeding area for waterfowl from the west borrow pit. Controlling the flow and level of water in the borrow pit and located therein was an earthen dam with a concrete spillway with removable flashboards. Defendants' employee, one Roy Addington, emplaced flashboards in the top of the dam in September, 1952. This caused water to back upon the lands of the two gun clubs and against the checks or levees marking the boundaries of the plaintiff's land with that of the two gun clubs. On the 8th of November, 1952, this water inundated about 110 acres of plaintiff's crop land. The water washed out several of the drain openings placed in the checks and also went over the top of the checks in several places. Witness Amarel, a neighboring farmer and former lessee of plaintiff's land, testified the water on plaintiff's land was over his hip boots in some places, and witness Murphy, also a neighboring farmer, testified the water was as deep as 30 inches in some places.

In September of 1952 Addington told plaintiff he was going to emplace the flashboards and flood defendants' land and that he was going to close the several drain openings on the boundary levees that day. Plaintiff told Addington he did not want the openings closed because he was not through irrigating, and that he would remove the board if put up then. Addington did not return that day, however. Plaintiff told Addington that he did not want the openings closed because he was not through irrigating, and that he would fill up the openings himself after he finished his irrigation, which was finished about one week later. Addington told plaintiff further at the time that he had "closed one of them already" and "closed the other partially," referring to the drain openings. When plaintiff finished this irrigation in September, he filled in the drain openings with soil and tamped it down with his feet.

Plaintiff had experienced trouble with defendants previous to 1952 when they had commenced the flooding of their land before he finished his irrigating and harvesting, but no actual flooding of his land had occurred.

Plaintiff learned of the flooding of his land from his neighbor, Amarel, on the 8th or 9th day of November and on the

day following went to see for himself. He then found the water had washed out the levees in some places and had gone over them in some spots.

There was testimony in the record that after emplacing the flashboards in the dam, defendants made no effort to determine the effect thereof with regard to plaintiff's land or to inspect the condition of the levees.

Plaintiff testified he had about 233 acres of tillable land under lease and that in 1952 he put 220 acres of it to milo corn and this was supported by other testimony. The flooding inundated about 110 acres of planted land. Plaintiff's loss was about one-half of his crop. He computed his loss in this fashion: From the 110 acres that were not flooded he received a total harvest of 1,566 sacks; from the 110 acres that were flooded he salvaged 253 sacks; and subtracting 253 from 1,566 he arrived at 1,313 sacks as the crop lost. Counsel for the respective parties stipulated the value of milo corn at Yuba City on November 8, 1952, was 3.3 cents per pound. Plaintiff estimated his loss to be 143,875 pounds of corn, but his counsel used the figure of 143,948 pounds in his argument to the jury, giving a gross figure for loss of $4,748.85. This larger poundage figure was obviously used by the jury in its computations of damage. Appellants, however, make no objection on this appeal to this relatively slight discrepancy and use the larger figure in their briefs for purposes of their own. In computing his net loss, plaintiff then deducted $287.74 as the probable expense of hauling to market the lost crop of 1,313 sacks of corn and the sum of $328.25 drying expenses on the same. This left the net of $4,132.86, which is the figure the jury gave as its verdict.

Plaintiff made no deduction for harvesting on the lost crop, which he admitted would be about one-half cent per pound ordinarily. Plaintiff said he made no deduction for harvesting costs because the flooded area was "harder to harvest and harder than it would have been for the whole thing if dry." He later said that it cost more to harvest the wet ground than the "whole thing" if dry. There was testimony in the record that the harvesting machine bogged down in the flooded area, that the grain left standing was scattered here and there, and that the grain that was harvested had to be removed to the dry area because it could not be left in the wet fields.

In their opening brief appellants make only two contentions, the first being that the court erred in giving an in-

struction requested by respondent, and the second being that
the court erred in refusing to give two instructions offered
by appellants of unavoidable accident.

At the request of respondent the court gave the fol-
lowing instruction:

"I instruct you that the plaintiff was under no duty to
anticipate that his lands would be flooded by the negligence
of another, or others, and he was not obliged to protect his
lands by dams, checks or otherwise against such flooding,
and failure on plaintiff's part so to do, does not constitute ·
contributory negligence."

Appellants contend that this instruction was prejudicial
error, in that it directed the jury to find for the plaintiff
without any qualifications and removed the questions of con-
tributory negligence from their consideration.    They state:

"The evidence shows that plaintiff volunteered to do an
act, the closing of the holes in the levees, and took this duty
from the hands of the defendants. He would not permit
the defendants to protect his property because he wanted to
drain across their land. In so volunteering, in this circum-
stance he was under a duty to use ordinary care in perform-
ing the act. The defendants therefore had done all they could
under the circumstances. The final acts of protection were
no longer under their control. Certainly the issue of whether
or not the plaintiff had exercised ordinary care should be
left to the jury."

Appellants appear to be under the impression that re-
spondent was under some obligation to keep water which was
backed up in the by-pass by appellants from flooding the land
of respondent. But no such duty devolved upon respondent
who was farming his leased land in a lawful manner. There
was, however, a duty devolving on appellants to so conduct
their operations that no water flowed upon respondent's
land and crop. The fact that in the growing of his crops
respondent made use of a small levee on his land did not re-
quire respondent to keep his levees in condition to keep out
the water backed up by appellants. Respondent could have
removed the levee altogether and appellants would still have
been required to keep their water off of respondent's land.
In giving the instruction complained of the court was fol-
lowing the rule laid down in *Kleinclaus* v. *Marin Realty Co.*,
94 Cal.App.2d 733, at 738 [211 P.2d 582], as follows:

"The tenor of the vast majority of the decisions is that a
landowner may make any lawful use of his land and that it

is not contributory negligence to neglect to take precautions to avoid future injury which can only occur as the result of another's negligence.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"We are satisfied to hold that plaintiffs were not obliged to anticipate the negligent flooding of their land by defendants and that their permitting the drainage ditch to become clogged before the flooding started cannot constitute contributory negligence. If they had chosen to fill up the drainage ditch deliberately before the danger from flooding by defendants' negligence occured they would only have been exercising the rights of an owner to use his land in any lawful fashion. The evidence is clear that the culvert was already clogged when the water first began to accumulate in the ditch."

We are satisfied that the court did not err in giving said instruction. Furthermore, there is abundant evidence that the water flowed over the top of the levee in a number of places so it is difficult to understand how appellants could have suffered any prejudice from the giving of said instruction even if it were held to be an erroneous statement of law.

■■■ Appellants next contend that there was prejudicial error by the court in refusing to give the jury an instruction on unavoidable accident. Appellants tendered two proposed instructions on unavoidable accident. In defining the term "unavoidable accident" this court said in *Tesone* v. *Reiman*, 117 Cal.App.2d 211, at page 216 [255 P.2d 48]:

". . . By this term is not meant an accident that could not be avoided at all. The term simply means an accident which is caused by something other than the actionable negligence of the parties involved. (*Parker* v. *Womack*, 37 Cal.2d 116, 120 [230 P.2d 823].) The so-called defense of inevitable or unavoidable accident amounts to nothing more than a denial by the defendant of actionable negligence."

■■ Appellants' denial of negligence would be enough to place in issue the question of unavoidable accident (*Parker* v. *Womack*, 37 Cal.2d 116 [230 P.2d 823]), but here such defense was specifically pleaded. The Parker case, and another one cited by appellants, to wit, *Sitkei* v. *Ralphs Grocery Co.*, 25 Cal.App.2d 294 [77 P.2d 311], both stand for the proposition that under a denial of negligence it is not error to give an instruction to the jury on unavoidable accident.

In *Lloyd* v. *Southern Pac. Co.*, 111 Cal.App.2d 626 [245

P.2d 583], a judgment for plaintiffs was affirmed on appeal where it was claimed, among other matters, that failure to give an instruction on unavoidable accident was error. Petition for rehearing and petition to the Supreme Court for hearing were denied. The court quoted the case of *Jaeger* v. *Chapman*, 95 Cal.App.2d 520, at 523 [213 P.2d 404], for the proposition that "while it would not have been error to have given such an instruction, it was not error to refuse to give it where all elements of defendant's liability were covered by other instructions." The case of *Parker* v. *Womack* was distinguished in that there the upper court held that it was not prejudicial error to give such an instruction and therefore a motion for a new trial after a verdict for plaintiffs was in error.

The *Parker* v. *Womack* case did reject the contention that the defense of unavoidable accident was limited to cases where the defendant relies upon evidence of a proximate cause beyond his control, and indicated it was available where there was no evidence that the accident was caused by factors other than the lack of care. The court pointed out in that case that the burden of showing unavoidable accident was not necessarily on the defendant; that a determination of unavoidable accident was also proper where the evidence merely shows that the plaintiff has failed in his proof.

The record in the instant case shows that the case was tried upon the respective parties' theories of negligence occasioned by want of ordinary care of one or the other, and the evidence adduced was entirely directed toward these theories and not upon any ground that the flooding was caused by any outside agency. Therefore, to have given the instructions offered by defendants would not have been error; but on the authority of the Lloyd and Jaeger cases, *supra*, it does not appear that the failure of the court to give one or both of the instructions was error unless the other instructions as given failed to cover the elements of defendants' liability. Instructions were given on negligence, contributory negligence, ordinary care, proximate cause, burden of proof, and duty to mitigate damages. No objection is raised as to the form and sufficiency of these instructions as given and they certainly cover all elements of defendants' liability and cover the only basis upon which unavoidable accident could have been determined under the record of this case, to wit, failure of plaintiff to prove negligence by defendants.

Appellants have filed a supplemental brief in which they

contend that the damages awarded by the jury were excessive and incorrectly calculated.

Appellants contend that the court committed prejudicial error in giving the following instruction offered by respondent:

"You are instructed that, in determining the amount of damage in this case, if you find from a preponderance of the evidence that any damage has been caused as a proximate result of the negligence upon which you base your findings of liability, you are first to determine from the evidence the market value of the probable yield of milo corn from the plaintiff's field, and you should then deduct therefrom the reasonable cost of producing and marketing such crop and also deduct therefrom the net market value of the crop actually produced, if any."

Appellants first contend that the giving of the instruction was prejudicial error because it did not direct the jury to deduct the 25 per cent of the gross value of the crop, which was the share of the landlord. Appellants chose to try their case on the same theory as respondent, inasmuch as they offered an instruction which is virtually identical to the one given and certainly their instruction does not even mention such reduction in damages as they now argue for. The said instruction offered by appellants, and not given by the court because covered by the instruction on damages offered by respondent, was as follows:

"If you find that the plaintiff is entitled to damages, they may be held to be the market value of the crop when matured less the cost of producing, harvesting and marketing it, deducting the value of any portion of the crop that may have been saved."

Furthermore, in his argument to the jury, which appears in the record, appellants' counsel made no mention of any such deduction of 25 per cent. So appellants would hardly be in a position to complain that the giving of said instruction on damages was error when they themselves requested a similar instruction, and when they at no time during the trial urged the point they are now making. For as stated in *Yolo Water & Power Co.* v. *Hudson*, 182 Cal. 48, at page 51 [186 P. 772]: "A party cannot complain of an instruction given at his own request or of an error in an instruction given at the instance of his adversary when he requests a substantially similar one. (14 R.C.L. 815, and cases cited.)" See also

*Collins* v. *Graves,* 17 Cal.App.2d 288 [61 P.2d 1198]; *Story* v. *Nidiffer,* 146 Cal. 549 [80 P. 692].

But even if appellants were entitled to raise the issue upon appeal, their contention would still be without merit. For all that the record shows is that respondent as lessee was paying a share of the gross crop as rent of the land. In 14 California Jurisprudence 2d, page 603, it is stated:

"If, however, a lease exists, creating a landlord and tenant relation, and even though it provides for payment of a portion of the crop, rather than money, as rent, the tenant has title to the entire crop until such time as he delivers to the landlord his share, unless the lease otherwise provides."

And as stated by this court in *Cox* v. *Miller,* 15 Cal.App.2d 494, at page 498 [59 P.2d 628]:

"It is true, as laid down in the case of *Clarke* v. *Cobb,* 121 Cal. 595 [54 P. 74], that where the relationship of landlord and tenant exists, and where the rent is to be paid by a share of the crop grown on the demised lands, and where there is no agreement to the contrary, the title to the crop is in the tenant and he is not a tenant in common in the crop with his landlord."

(See also *Imperial Valley Land Co.* v. *Globe Grain & Mill. Co.,* 187 Cal. 352 [202 P. 129]; *Wolfsen* v. *Hathaway,* 32 Cal.2d 632 [198 P.2d 1]; *Holt Mfg. Co.* v. *Thornton,* 136 Cal. 232 [68 P. 708]; *Hicks* v. *Butterworth,* 30 Cal.App. 562 [159 P. 224]; Civ. Code, § 1926.)

We therefore conclude that upon the record here and the law applicable thereto, respondent as lessee of the land had title to the crops damaged or destroyed, and so was entitled to recover in this action all damages to his crops resulting from the acts of appellants.

Appellants' final contention is that the amount of damages awarded respondent should be reduced by the sum of $719.74, for harvesting expense. This would be on the basis of one-half cent per pound on 143,948 pounds. It is apparent from the record that the jury took the figure of 1,313 sacks or 143,948 pounds at $3.30 per hundred pounds, making $4,748.85, and deducted therefrom $287.74 for hauling charges and $328.25 for drying charges, leaving a balance of $4,132.86, the amount of the jury's verdict. These were the figures used by counsel for respondent in his argument to the jury.

Appellants argue correctly that the jury should have followed the court's instructions on damages and deducted the cost of harvesting. Respondent testified that the reasonable

cost of harvesting a crop of corn was one-half cent per pound, and this was the only testimony as to said cost. If the 143,948 pounds of corn for which respondent was allowed damages had been harvested the cost of said harvesting would have been $719.74. ■ Respondent was not entitled to be awarded the full market price of the corn lost due to the acts of appellants without deducting therefrom the said sum of $719.74.

The judgment appealed from is hereby modified by reducing same in the amount of $719.74, and in all other respects the judgment is affirmed, the parties to bear their own costs on appeal.

Van Dyke, P. J., and Peek, J., concurred.