[Civ. No. 8980. Fourth Dist., Div. Two. Apr. 2, 1969.]

WESTERN SALT COMPANY, Plaintiff and Appellant, v. CITY OF NEWPORT BEACH et al., Defendants and Respondents.

Woolley, Collins & Ward and William O. Ward III for Plaintiff and Appellant.

Parker, Stanbury, McGee, Peckham & Garrett, Garrett & Dimino, Franklin J. Dimino, Kirtland & Packard, Austin S. Smith, Jr., Cummins, White & Briedenbach and James O. White for Defendants and Respondents.

KERRIGAN, Acting P. J.—For several years plaintiff has operated a salt plant in the upper end of Newport Bay in Newport Beach. The facility is devoted to the production of salt from ocean water by a process of solar evaporation. In the salt producing process, ocean water is deposited in holding ponds, eventually transferred from the holding ponds into saturators as the salt concentration increases, and the concentrated ocean water [brine] is then transferred into crystallizers where salt is precipitated out of solution. The process for producing a crop of salt takes approximately one year.

Plaintiff leased the salt works from The Irvine Company by a written agreement executed on December 31, 1959. At the time the lease was signed, the city owned and maintained a road on the eastern boundary of the salt works known as Jamboree Road. The road ran in a generally northwest-southwest direction. Near Jamboree Road was a crystallizer known as Vat H. A salt vat is an open pond. A vat used as a crystallizer contains a salt floor 3-4 inches thick. The floor supports equipment utilized in harvesting salt as well as to prevent the crystallized salt from being contaminated by the mud floor underneath the crystallizer. Salt floors are subject to damage by fresh water in the event the water is not drained within 3-4 days. Fresh rainwater falling into a crystallizer will float on top of the brine for 3-4 days, and if drained off during such period, will not damage the salt underneath. If mud or silt penetrate the vat, the salt becomes stained and unsaleable.

In early 1962 the defendant, City of Newport Beach, decided to relocate Jamboree Road between East Bluff Drive and Palisades Road, and the proposed relocation required that it acquire a portion of the land leased to plaintiff by The Irvine Company. Irvine, with plaintiff's consent, executed an easement for road purposes in favor of the city.

Salt ponds such as Vat H were enclosed with a wall. Because of the relocation of Jamboree Road, Vat H, which was 5 acres in size, was reduced to 2½ acres. The reduction

occurred in stages. After the salt was harvested in 1962, the easterly ''wall'' was moved to the west. This wall was about 700 feet long and about 2 feet high generally, but rose higher at certain points. In 1963 the wall was again moved another 25-30 feet to the west. Later that year, there was a final relocation, which reduced Vat H to its present size. The additional space provided by moving and removing the wall of Vat H was used for the building of Jamboree Road Realignment.

After its acquisition of the right-of-way from The Irvine Company, the City commenced the construction of the improvement and the project was designated as ''Jamboree Road Realignment.'' It retained the defendant, Cox Brothers Construction Company, as contractor to build the roadbed and roadway. The defendant, Porter, O'Brien and Armstrong, an engineering firm, performed a topographical survey and an alignment survey for the purpose of preparing the original design for the Jamboree Road relocation. The plans called for a 2 percent slope from the crown running from east to west to a berm on the westerly side of the roadway, the purpose of the slope being to cause water falling on the road to drain to the west. The road was designed in such a way as to cause water that fell upon the roadway to discharge into a ditch between the roadbed and Vat H. The ditch would provide drainage for the surface water and would have been sufficient to prevent flooding of the plaintiff's adjacent salt vat either during or after construction of the roadway. Water running from the road into the 1-foot ditch would be ultimately conducted northerly to the Orange County Flood Control Channel. However, when the roadbed was constructed, there either was insufficient room for installation of the 1-foot drainage ditch, or the ditch had been filled in during construction. Simply stated, no ditch existed; Vat H abutted directly on the roadbed.

Between 8 a.m. on November 22 and 8 a.m. on November 23, 1965, 1.85 inches of rain fell on the area covered by the Jamboree Road Realignment. Mud, silt and 14-15 inches of muddy rainwater ran into Vat H. The salt being crystallized in Vat H was damaged and, at the time of its contamination, it was only 30-60 days from being harvested. The plaintiff sustained substantial damages as a result thereof.

During the course of construction of the roadbed, plaintiff's superintendent, Dill, observed that the drain next to

Vat H had been filled in. His testimony was to the following effect: The fill alongside Vat H had been in place for four months prior to flooding of Vat H; he did not know the fill would cause the vat to flood; he did not have an opinion where the water collected on the roadway would go in the event it rained inasmuch as he was not an engineer; he did not attempt to make a ditch between the roadbed fill and Vat H in order to provide a drainage course; he would have dug a ditch if he had known the fill was going to cause a run-off into the vat; one of his routines was to check around each of the vats any time it rained to look at run-off; he was "alarmed some" when the dike or natural ditch was eliminated; he did not tell the people putting in the fill to take care so that the salt beds would not be wrecked; none of plaintiff's employees took any precautions such as building a higher dike or higher header boards to protect Vat H prior to the flood; there was nearly 1 inch of rain eight days before the incident, but there was no damage to Vat H; while surface waters destroyed or damaged all the other vats except Vat H in 1963, Jamboree Road Realignment was not in existence at that time, and the run-off came from a different direction; prior to this occurrence, he believed the property between the vat and the fill was part of the City's right-of-way, and he was not willing to dig a trench to protect Vat H because he thought it was someone else's property.

Plaintiff filed this action against the City, the general contractor, the engineering firm, and a former partner of the engineering firm for $20,000 damages to the salt in Vat H. Initially, plaintiff's complaint contained two causes of action: the first was predicated on the common law theory of strict liability. The second cause of action was framed in terms of negligence. The defendants denied liability and set up affirmative defenses of contributory negligence and assumption of risk. During trial, plaintiff dismissed its first cause of action based on strict liability resulting from extrahazardous activity. Over plaintiff's objection, the court instructed the jury on the subjects of contributory negligence and assumption of risk. Defense counsel thoroughly argued both doctrines in urging that the plaintiff's superintendent, Dill, should have taken affirmative action to protect Vat H from damage prior to the flooding. Within an hour after retiring for deliberation, the jury requested a rereading of the instructions on the doctrine of contributory negligence. The following day, the jury

requested a rereading of Dill's testimony on the subject of whether he took any precautionary measures to protect Vat H ' prior to the flooding. Within 15 minutes after Dill's testimony had been read, the jury returned with a defense verdict.

█ It is not contributory negligence for a landowner or possessor to continue to make use of his property in any lawful manner even though he may know or suspect that such use may be interfered with by water carelessly diverted to his property by a neighbor. (*Fraler* v. *Sears Union Water Co.*, 12 Cal. 555, 558 [73 Am.Dec. 562]. He is under no duty to anticipate that his land will be flooded by the negligence of a neighbor; he is not obliged to protect his land by dam, checks or otherwise against such flooding, and failure on plaintiff's part so to do does not constitute contributory negligence. (*Goodwin* v. *Braden,* 134 Cal.App.2d 34, 38 [285 P.2d 330].)

In *Kleinclaus* v. *Marin Realty Co.*, 94 Cal.App.2d 733 [211 P.2d 582], plaintiffs owned an air field which was flooded when defendants pumped water onto adjoining property and the water seeped under plaintiffs' dike; the trial court found in favor of defendants on the ground that plaintiffs were contributorily negligent in not keeping a drainage ditch on their own property open so that the seepage could pass across plaintiffs' land without causing any injury; the reviewing court, in holding that contributory negligence was not a valid defense, used the following language: ". . . [plaintiffs] were under no duty to anticipate defendants' negligent invasion of their land or to have any drainage facilities on their land to carry off water negligently cast thereon by defendants," and relied on the rationale expressed in *LeRoy Fibre Co.* v. *Chicago M. & St. P. Ry. Co.*, 232 U.S. 340, 349-350 [58 L.Ed. 631, 634, 34 S.Ct. 415, 417] wherein the Supreme Court indicated that ". . . the rights of one man in the use of his property cannot be limited by the wrongs of another. The doctrine of contributory negligence is entirely out of place."

Similarly, in an action for damage for the escape of irrigation water from a ditch resulting in damage to almond trees on the neighboring land below, the trial court erred in instructing on contributory negligence where there was no evidence that plaintiffs contributed to the break in defendants' ditch or the escape of the water. (*Clark* v. *DiPrima,* 241 Cal.App.2d 823, 825-826 [51 Cal.Rptr. 49].)

In *Clark, supra,* the reviewing court rationalized that in order for plaintiff to be charged with contributory negligence

he must in some manner cause the diversion, and that "the vice of permitting . . . [the defendant] to argue contributory negligence to the jury, and of the court instructing the jury on the law of contributory negligence, lies in the complete bar to any recovery by a plaintiff who contributes to the cause of an accident as contrasted with the doctrine of mitigation of damages that rests on proof of avoidable consequences after the happening." (*Ibid.*, p. 826.)

While a plaintiff may be guilty of contributory negligence where he causes the diversion of water resulting in the inundation of his property (*Maumus* v. *Champion*, 40 Cal. 121), the doctrine is not applicable in the case under review. There is no evidence that plaintiff contributed in any manner to the diversion of the surface water so as to cause the flood. ing of the salt works. Stated succinctly, there is no evidence that plaintiff or its employees caused the water to flood the salt works by eliminating the dike. Conversely, there is substantial evidence that one or more of the defendants were negligent in eradicating the ditch or in failing to provide temporary drainage during the construction of the roadbed.

The general contractor had the duty under its contract with the City to protect adjacent land during the construction of the Jamboree Road Realignment. The engineering firm took the position that it was the duty of the contractor to provide drainage facilities during the course of construction. The general contractor maintained that the plans had not been properly prepared by the engineering firm so as to provide a drainage area between the roadway and the vat. The City had personnel overseeing the construction work, and its employees had actual knowledge of the elimination of the drainage ditch. Manifestly, plaintiff and its personnel did not create the roadbed, did not eliminate the dike, were not responsible for the installation of temporary drainage facilities during construction, and, therefore, did not contribute in any manner to the diversion of the surface waters.

The critical issue during trial was whether the landmark case of *Keys* v. *Romley*, 64 Cal.2d 396 [50 Cal.Rptr. 273, 412 P.2d 529], abrogated or modified the general rule that contributory negligence is not a defense in an action for the unintentional diversion of surface waters.

In *Keys, supra,* plaintiff, a lower landowner operated a commercial building on his property; defendant, an upper possessor, constructed an ice rink and paved the area around

the building with asphalt; downspouts were placed on the western wall of the ice rink above ground level so that rainwater flowing through the spouts was directed onto the paved area alongside the rink and flowed onto plaintiff's property; no flooding had occurred prior to the construction of defendant's ice rink and pavement; in each of the three years thereafter, rainwater from defendant's property flooded the plaintiff's premises; the reviewing court reversed a judgment in plaintiff's favor because the trial court applied the ''strict civil law rule'' governing surface waters; in rejecting the civil law rule as being detrimental to the development of land in a modern society, the Supreme Court adopted a ''modified civil law rule'' whereby not every intentional interference with natural drainage is actionable. Liability depends upon the reasonableness of the parties' conduct. (*Ibid.*, p. 409.) If the upper owner is reasonable and the lower owner is unreasonable, the upper owner wins; if the upper owner is unreasonable and the lower owner reasonable, the lower owner wins; and if both upper and lower owners are reasonable, the lower wins. (*Burrows* v. *State of California,* 260 Cal.App.2d 29, 32-33 [66 Cal.Rptr. 868].)

Defendants urge that the following language in *Keys* establishes contributory negligence as a defense in surface water cases: ''It is equally the duty of any person threatened with injury to his property by the flow of surface waters to take reasonable precautions to avoid or reduce any actual or potential injury.'' (*Keys* v. *Romley, supra,* 64 Cal.2d 396, 409.) However, *Keys* involved an intentional diversion of surface waters. The flooding of Keys' land occurred over a three-year period. (*Ibid.*, p. 399.) ''Most of the litigation over nontrespassory invasions of interest in the use and enjoyment of land involves situations in which there are continuing or recurrent invasions resulting from continuing or recurrent conduct. In such cases the first invasion resulting from the actor's conduct may be either intentional or unintentional, but when the conduct is continued after the actor knows that the invasion is resulting from it, further invasions are intentional.'' (Rest., Torts, § 825, com. (b), p. 239.) In cases involving the intentional invasion of another's interest in land, one of the factors to be considered is the burden upon the person harmed of avoiding the harm. (Rest., Torts, § 827, p. 244.) The burden on the person harmed of avoiding the harm applies only to *intentional* invasions. (Rest., Torts,

§ 827, comment on clause (e), p. 249.) Consequently, the concept expounded in *Keys* relating to the duty of an owner to take reasonable precautions to avoid injury applies only to actions involving the intentional diversion of surface waters.

*Keys* did not change the rule precluding contributory negligence as a defense in surface water cases. The court was not confronted with the issue of contributory negligence. Rather, it was concerned with the adoption of a standard rule for determining liability for damages resulting from nontrespassory invasions of another's interest in the private use and enjoyment of land. In promulgating the ''modified civil law rule,'' the court formulated a reasonableness of conduct test. In determining the issue of reasonableness of conduct for the purpose of fixing liability in cases involving an intentional invasion, the court stated that the factors to be considered were those defined in sections 822-833 of the Restatement of Torts.

The Restatement provides that the actor is liable in an action for damages for a nontrespassory invasion of another's interest in the private use and enjoyment of land in two instances: (1) If the invasion is *intentional* and unreasonable; *or* (2) *unintentional* and otherwise actionable under the rules governing liability for negligent conduct. (Italics added.) (Rest., Torts, § 822(d)(i)(ii).)

Not only does the Restatement of Torts expressly recognize the integrity of the theory of negligence in nontrespassory invasion cases, but *Keys* strongly reaffirmed the negligence concept as a doctrine for imposition of liability in cases involving the unintentional diversion of surface waters by definitely and unequivocally stating that an upper *''owner should not escape liability when he is negligent.''* [Italics added.] (Ibid., p. 409.)

While there is dictum in *Burrows* v. *State of California, supra,* 260 Cal.App.2d 29, 33-34. indicating ''. . . negligence as such is an irrelevant concept in surface water cases,'' the court undoubtedly was merely taking cognizance of the rationale contained in the Restatement to the effect that most invasions are recurrent or continuing and are therefore regarded as intentional. (Rest., Torts, § 825, com. (b), p. 239.) In the case under review, the diversion was unintentional and the reasonableness of conduct formula was inapplicable.

The complaint herein was framed in terms of negligence. The pretrial order indicated that the action was proceeding to

trial on the negligence theory. The court instructed the jury on the doctrines of negligence, contributory negligence, and the reasonableness of the parties' conduct. The instructions on the reasonableness of the parties' conduct were paraphrased from the headnotes of *Keys*. The dilemma of the trial court was understandable inasmuch as the action had been initiated prior to *Keys*, and the trial was held shortly following the rendition of *Keys*. The result was that the jury must have been thoroughly confused.

The issue then arises whether the instructions on contributory negligence were prejudicial. Obviously, the jury determined that one or more of the defendants were negligent as reflected by its inquiry on the subject of contributory negligence. The prejudicial effect of the contributory negligence instructions is apparent since the jury returned on one occasion with a request for a rereading of the instructions on the subject, and later returned for a rereading of the testimony of the plaintiff's superintendent as to whether he took any ''precautions'' to prevent the flooding before the occurrence. Within 15 minutes thereafter, the jury arrived at a defense verdict.

Judgment reversed.

Tamura, J., and Fogg, J. pro. tem.,* concurred.

Petitions for a rehearing were denied April 23, 1969, and respondents' petitions for a hearing by the Supreme Court were denied May 28, 1969. Mosk, J., was of the opinion that the petition should be granted.

*Assigned by the Chairman of the Judicial Council.