[S. F. No. 21556. In Bank. Apr. 11, 1966.]

WESLEY C. KEYS et al., Plaintiffs and Respondents, v. HAZEL F. ROMLEY, as Executrix, etc., et al., Defendants and Appellants.

Barnett & Wood and Edmund S. Barnett for Defendants and Appellants.

John F. Ganong for Plaintiffs and Respondents.

MOSK, J.—Defendants appeal from a judgment of the Superior Court of Contra Costa County permanently enjoining them from interfering with and causing surface waters to be discharged from their land onto plaintiffs' adjoining land in a greater quantity or in a different manner than would occur under natural conditions. Defendant Romley also appeals from the award of $4,384.78 for injuries caused to plaintiffs' property as a result of the discharge of surface waters.

Plaintiffs Wesley and Ruth Keys are the owners of real property in the City of Walnut Creek. In 1956 the Keys erected a radio, television, and appliance store on their property, and in 1959 they formed Walnut Creek T.V. and Appliance, Inc., the plaintiff corporation, in which they are

the sole stockholders, and to which they leased, in the same year, the appliance store.

Defendants Gus and Engra Lusebrink are the owners of a parcel of land abutting that of the Keys on the northeast. On December 20, 1956, the Lusebrinks leased their unimproved property to Edward G. Romley. In 1957, Romley, who was himself a general contractor, began construction of an ice rink on his leased property and paved the area around the building with asphalt. Some grading and leveling of the land was done by Romley before beginning the actual construction work. Four downspouts were placed on the west wall of the ice rink, above ground, so that the rainwater flowing through them was directed onto the paved area alongside the rink. From there the water flowed in a southwesterly direction onto plaintiffs' property.

At the time the Keys erected their store in 1956, dirt was excavated and placed or piled across the rear portion of their property in a north-south direction. As a result of an excavation in 1957 for the purpose of building a small parking area on the northwest corner of their property, the Keys placed additional dirt on the pile. Shortly thereafter they also built an up-ramp and a down-ramp leading to the rear of their store.

In the spring of 1958 Romley completed some additional grading and leveling, in part on the asphalt driveway on the property leased by him and in part to the rear of the Keys property. Keys testified that this grading raised the level of the driveway and changed its slope. In the fall of 1958 the Keys removed the pile of loose dirt at the rear of their property.

Beginning in January 1959 the Keys property was flooded and eroded as a result of surface waters flowing onto it from defendants' adjoining land. Keys testified he attempted to alleviate the flooding by diverting the water away from his building, first by constructing a ditch, and later by building a small dam with railroad ties. The flooding continued, however, throughout 1959, 1960, and 1961. In January 1962, by agreement of the parties, Romley erected a cement curb at a cost of $398.07 along the Romley-Keys boundary line. By agreement this was done without prejudice to the rights of either party and without constituting an admission of any kind.

It was stipulated at the trial that defendants' property is a tenement higher than that of the Keys. The trial court

found that the flooding did not occur prior to the construction of the building and grading and paving on the Romley property. The court also found that frequent heavy and damaging rainwater flowed from the Romley property to the Keys property as a result of the construction of the ice rink and the asphalt pavement.

From these findings the trial court concluded that Romley gathered surface waters on his land by artificial means and discharged said waters onto the lower land of plaintiffs in a greater volume and in a different manner than had occurred prior to the construction on his property. The court granted plaintiffs damages for the injuries incurred and issued an injunction restraining Romley from causing further damage to the Keys property.

Water diffused over the surface of land, or contained in depressions therein, and resulting from rain, snow, or which rises to the surface in springs, is known as "surface water." It is thus distinguishable from water flowing in a fixed channel, so as to constitute a watercourse, or water collected in an identifiable body, such as a river or lake. The extraordinary overflow of rivers and streams is known as "flood water." (Tiffany on Real Property (3d ed.) § 740; 8 Cal.L.Rev. 197.)

There are three basic rules governing surface waters followed in the United States, although each rule has an infinite number of variations.[1]

The first is the *common enemy doctrine*.[2]

Stated in its extreme form, the common enemy doctrine holds that as an incident to the use of his own property, each landowner has an unqualified right, by operations on his own land, to fend off surface waters as he sees fit without being required to take into account the consequences to other landowners, who have the right to protect themselves as best they can.

The doctrine appears to have had its American inception in decisions of Massachusetts courts about 1850 or later, and

[1] The numerous variations, departures and exceptions to each rule have caused many opinion and text writers to throw up their hands in despair. See, e.g., the comment in 8 California Law Review (1919) 197, 198: "But why all this pother about differences between the civil law and the common law? Are not the two systems in accord . . . as in fact they seem on all water law."

[2] The common enemy rule is more or less followed in the following jurisdictions: Arkansas, Connecticut, District of Columbia, Hawaii, Indiana, Kansas, Maine, Massachusetts, Mississippi, Missouri, Montana, Nebraska, New York, North Dakota, Ohio (urban areas), Oklahoma, Pennsylvania, South Carolina, Virginia, Washington, and Wisconsin.

the "common enemy" phrase was apparently first used in stating the rule in *Town of Union* v. *Durkes* (1875) 38 N.J.L. 21.

The courts which evolved and applied the extreme common enemy doctrine apparently acted from an exaggerated and uncritical respect for the rights and privileges of land ownership as expressed in the maxim *cujus est solum,* together with an apparent belief that the only alternative would be to adopt the rule of natural servitude of natural drainage which would hinder the improvement of land and stultify economic development.

The common enemy doctrine has been considerably qualified in later decisions, and it is doubtful that any modern court would apply it in its full rigor. The courts of a number of the jurisdictions in which the common enemy doctrine has been adopted as the basic rule have modified the doctrine to some degree by importing into it qualifications based upon concepts of reasonable use or of negligence. For example, the Arkansas court has said that in fending off surface waters the landowner must do no "unnecessary" harm to others. (*Turner* v. *Smith* (1950) 217 Ark. 441 [231 S.W.2d 110]; *Stacy* v. *Walker* (1953) 222 Ark. 819 [262 S.W.2d 889].) The common enemy doctrine, as modified by the requirement that the landowner must not negligently or unnecessarily injure his neighbor's land was recognized in *Elsasser v. Szymansk·* (1956) 163 Neb. 65 [77 N.W.2d 815]. In *Lunsford* v. *Stewart* (1953) 95 Ohio App. 383 [120 N.E.2d 136], it was held that as to urban areas the rule provided the land might be improved so as to divert surface waters so long as the landowner acted in a reasonable manner. And the requirement of "reasonable" action was apparently also recognized in *Keiser* v. *Mann* (1956) 102 Ohio App. 324 [143 N.E.2d 146]. The Oklahoma court has given its approval to the common enemy doctrine as modified by the rule of reason, said the court in *King* v. *Cade* (1951) 205 Okla. 666 [240 P.2d 88], adding that under this rule each proprietor might divert surface water, casting it back on, or passing it along to, the next proprietor, provided he can do so without injury to the adjoining landowners, but no one is permitted to sacrifice his neighbor's property in order to protect his own. It was held that a landowner who, by constructing artificial channels, cast the surface water upon the defendant's lower land in such a manner as to cause injury was not entitled to complain when the lower owner erected a dam to fend off the water.

The common enemy doctrine is occasionally denominated the *common law rule,* although the origin of that confusion has not been identified. When the latter term is applied to the doctrine, however, it may create problems, particularly in states which by statute recognize common law as the rule of decision. Thus, in *Walker* v. *New Mexico & S.P. R.R. Co.* (1897) 165 U.S. 593 [17 S.Ct. 421, 41 L.Ed. 837], the court held that since the Territory of New Mexico had adopted common law generally, a conclusion was required that it had also adopted the so-called common law (common enemy) rule as to surface waters.

The second rule governing surface waters is known as the *civil law rule.*[3]

Diametrically opposed to the common enemy doctrine is the basic civil law rule which recognizes a servitude of natural drainage as between adjoining lands, so that the lower owner must accept the surface water which drains onto his land but, on the other hand, the upper owner has no right to alter the natural system of drainage so as to increase the burden. The doctrine apparently had its inception in Roman law and the Code Napoleon.[4] Kinyon and McClure succinctly describe it this way in their article, *Interferences With Surface Waters* (1940) 24 Minnesota Law Review 891, 893: "[T]he civil law rule . . . is that a person who interferes with the *natural* flow of surface waters so as to cause an invasion of another's interests in the use and enjoyment of his land is subject to liability to the other."

The rule finds its justification in the concept that those purchasing or otherwise acquiring land should expect and be required to accept it subject to the burdens of natural drainage. It has the advantage that rights thereunder are readily predictable, and thus tends to avoid the contests likely to occur under the common enemy doctrine.

The civil law rule, if strictly applied, admittedly has some tendency to inhibit improvement of land, since almost any use of the property is likely to cause a change in the natural drainage which may justify complaint by an adjoining landowner. As a result, some courts normally applying the civil

---

[3]The civil law rule is generally followed in Alabama, Arizona, Georgia, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maryland, Michigan, Mississippi, New Mexico, North Carolina, Ohio (rural areas), Oregon, Pennsylvania (rural only), South Dakota, Tennessee, Texas, and Vermont.

[4]Wiel, *Waters: American Law and French Authority* (1919) 33 Harv. L.Rev. 133. The first American case applying the rule was an 1812 decision in Louisiana, *Orleans Navigation Co.* v. *New Orleans,* 1 La. (2 Mart. [O.S.]) 214.

law rule have suggested that it is not adaptable to the needs of urban communities, where the primary use of land is the erection of structures which are likely to interfere with natural drainage, and accordingly those courts have adopted common enemy or modified common enemy rules in cases involving such land.

The third surface water doctrine is generally known as the *rule of reasonable use*.[5]

A few jurisdictions, finding it undesirable to apply either the civil law or common enemy doctrines in their rigid or extreme forms, have evolved a rule of *reasonable use* which attempts to determine the rights of the parties with respect to the disposition of surface waters by an assessment of all the relevant factors.

Such an approach has the virtues of flexibility and of avoiding the harsh results which occasionally may be reached under extreme applications of the other rules; but since the rights of the parties are ordinarily regarded as involving issues of fact for the jury, the predictability of result under the other rules may be lost.

The reasonable use rule was apparently first adopted in New Hampshire. Noting the inconvenience which it asserted would arise from adopting extreme rules that a landowner has either no right of drainage or an absolute right, the court in *Bassett* v. *Salisbury Mfg. Co.* (1862) 43 N.H. 569 [82 Am.Dec. 179], held that the sole ground of qualification of the landowner's right of drainage was the similar rights of others, the extent of the qualification being determined under the rule of reasonable use, the rights of each landowner being similar and his enjoyment dependent upon the action of the other landowners, so that the rights must be valueless unless exercised with reference to each other. As in the case of watercourses, so in drainage a man may exercise his own right on his land as he pleases, provided he does not interfere with the rights of others. Whatever exercise of one's right or use of one's privilege in such cases is, in view of the rights of others, such a reasonable use or management is not an infringement of the rights of others, but any interference with natural drainage injurious to the land of another and not reasonable is unjustifiable. What is, in any particular case, reasonable use or management has been held to be a mixed question of law and fact to be submitted to the jury under proper instructions.

[5]This is expressly adopted in Minnesota, New Hampshire and New Jersey, and impliedly in Maryland and Pennsylvania (for urban land).

Proponents of the reasonable use rule urge that it encounters none of the objections inseparable from the other doctrines, and obviates difficulties and anomalies which would otherwise exist.

The rule of reasonable use is authoritatively described in *Enderson* v. *Kelehan* (1948) 226 Minn. 163, 167-168 [32 N.W. 2d 286]: "the rule is that in effecting a reasonable use of his land for a legitimate purpose a landowner, acting in good faith, may drain his land of surface waters and cast them as a burden upon the land of another, although such drainage carries with it some waters which would otherwise have never gone that way but would have remained on the land until they were absorbed by the soil or evaporated in the air, if (a) there is a reasonable necessity for such drainage; (b) if reasonable care be taken to avoid unnecessary injury to the land receiving the burden; (c) if the utility or benefit accruing to the land drained reasonably outweighs the gravity of the harm resulting to the land receiving the burden; and (d) if, where practicable, it is accomplished by reasonably improving and aiding the normal and natural system of drainage according to its reasonable carrying capacity, or if, in the absence of a practicable natural drain, a reasonable and feasible artificial drainage system is adopted."

The reasonable use rule as applied to percolating water was held in *Swett* v. *Cutts* (1870) 50 N.H. 439 [9 Am.Rep. 276] to be equally applicable to surface waters, the court holding that to apply other doctrines forbidding the diversion of drainage would to a great extent prevent the beneficial enjoyment and improvement of land, while to give the landowner the absolute unqualified right of disposing of such water would be productive of great mischief to neighbors and lead to interminable struggles between them, whereas the reasonable use doctrine adapted itself to the ever varying circumstances of each particular case and could take account of all the circumstances, among them the nature and importance of the improvements to be made, the reasonable foreseeableness of the injury, the extent of the interference with the water, and the amount of injury done to other landowners as compared with the value of the improvements. (See also *Franklin* v. *Durgee* (1901) 71 N.H. 186 [51 A. 911, 58 L.R.A. 112].)

New Jersey, which had been one of the pioneers in adopting the common enemy doctrine and had applied it with considerable strictness, abandoned the old rule in *Armstrong* v. *Francis Corp.* (1956) 20 N.J. 320 [120 A.2d 4, 59 A.L.R.2d

413]. There the court said that the casting of surface waters from one's own land upon the land of another, in circumstances where the resultant material harm to the other was foreseen or foreseeable, would appear to be as tortious and actionable as any other unreasonable use of the possessor's land. Concluding that the problems raised by the diversion of surface waters should be approached under tort rather than property concepts, the court declared its adherence to the reasonable use rule, which was said to have the particular virtue of flexibility, since the issue of reasonableness became a question of fact to be determined in each case under a consideration of all the relevant circumstances, including such factors as the amount of harm caused, its foreseeability, the purpose or motive with which the act was done, and the consideration whether the utility of the use of the land outweighed the gravity of the harm resulting.

### The Law in California

The rights and liabilities of adjoining landowners in California with respect to the flow of surface waters, have generally been determined by the rule of civil law, *aqua currit et debet currere ut currere solebat.*[6] The civil law rule was first adopted by the Supreme Court of California in 1873 (*Ogburn* v. *Connor* (1873) 46 Cal. 346 [13 Am.Rep. 213]), and has been generally recognized as the prevailing law of surface waters in the state ever since. (See, e.g., *Archer* v. *City of Los Angeles* (1941) 19 Cal.2d 19, 27 [119 P.2d 1]; *LeBrun* v. *Richards* (1930) 210 Cal. 308, 313-314 [291 P. 825, 72 A.L.R. 336]; *Heier* v. *Krull* (1911) 160 Cal. 441, 444 [117 P. 530]; *Los Angeles Cemetery Assn.* v. *City of Los Angeles* (1894) 103 Cal. 461, 466-467 [37 P. 375]; *McDaniel* v. *Cummings* (1890) 83 Cal. 515, 519 [23 P. 795, 8 L.R.A. 575]; *Voight* v. *Southern Pac. Co.* (1961) 194 Cal.App.2d Supp. 907, 909-910 [15 Cal.Rptr. 59]; *Gonella* v. *City of Merced* (1957) 153 Cal.App.2d 44, 51 [314 P.2d 124]; *Andrew Jergens Co.* v. *City of Los Angeles* (1951) 103 Cal.App.2d 232, 235 [229 P.2d 475].) Under our civil law rule the owner of an upper, or dominant, estate is entitled to discharge surface water from his land as the water naturally flows. As a corollary to this, the upper owner is liable for any damage he causes to adjacent property by the discharge of water in

---

6 "Water runs and ought to run as it is accustomed to run." For discussion of the early English origin of this phrase, see Wiel, *Waters: American Law and French Authority* (1919) *supra*, 33 Harv. L.Rev. 133, 144.

an unnatural manner. In essence, each property owner's duty is to leave the natural flow of surface water undisturbed.

The civil law rule has not been universally accepted in its application to urban land; and as a result it has been suggested in the cases that an undefined exception to the rule exists in California with respect to urban land. (*Los Angeles Cemetery Assn.* v. *City of Los Angeles* (1894) *supra,* 103 Cal. 461, 467; *Voight* v. *Southern Pac. Co.* (1961) *supra,* 194 Cal.App.2d Supp. 907, 910; *Jaxon* v. *Clapp* (1919) 45 Cal.App. 214 [187 P.69].) Since defendants here have made a similar contention on appeal, we find it appropriate to examine the California law of surface waters and to ascertain whether it remains adaptable to the current milieu.

As discussed heretofore, neither the common enemy nor the civil law rules have been applied undiluted in their respective jurisdictions. The common enemy rule has often been modified to require each property owner to exercise care in protecting his property from surface waters, and civil law states have permitted upper owners to change the flow of surface water in making reasonable use of their land. Some jurisdictions follow one rule for rural and another for urban land.

Thus we are urged to consider the reasonable use rule as an attempt to cope with the problem through the use of tort rather than property concepts. Adherents of the reasonable use rule have criticized both the civil law rule and the common enemy rule as being too rigid and inflexible, unjust in many cases, and inappropriate in view of the complex modern development of land in urban areas. (See, e.g., Kinyon and McClure, *Interferences With Surface Waters* (1940) *supra,* 24 Minn.L.Rev. 891.) While these criticisms may validly apply to both rules, we need not consider the common enemy rule for it has never been followed in California, and, in fact, was summarily rejected nearly a century ago in *Ogburn* v. *Connor* (1873) *supra,* 46 Cal. 346, 352. However, we must examine the civil law rule to determine whether it has the shortcomings charged.

Admittedly the rule was adopted when California was primarily a rural society, and apparently it has never been strictly applied in a case involving urban land. On the other hand, no documentation has been produced to establish that the rule has in fact impeded urban development in the state.[7]

---

[7] A problem not infrequently arising is determination whether land is rural or urban. A developer buys an orange grove and plans to convert it into a subdivision—is that property deemed rural or urban?

A number of highly urbanized states follow the rule, and California's phenomenal growth rate, to which no one can be oblivious and of which this court may take judicial notice, appears unstunted by the existence and application of the civil law rule since 1873.

Defendants contend that California has never observed the civil law rule with respect to urban property. It is true that some courts have alluded to an exception for urban areas, although the distinction has been the basis for decision in only one reported case—and that in the Appellate Department of the Superior Court of Orange County. (*Voight* v. *Southern Pac. Co.* (1961) *supra,* 194 Cal.App.2d Supp. 907.) In *Voight* the court held that the "general doctrine must yield to allow changed conditions which come about in the natural growth and development of the community." (*Id.* at p. 910.) Nevertheless, the exception which the court fashioned was not actually based on the fact that a different rule was essential for urban areas.

It appears, therefore, that the civil law rule has been well settled and generally applied in California for almost a century, although it may be unnecessarily rigid and occasionally unjust, particularly in heavily developed areas. It places the entire liability for damages on one owner on the basis of the unvarying formula that he who changes conditions is liable. Furthermore, the rule creates a not infrequent onerous burden of proof as to what the natural conditions were or would be if not altered. As a result, there has been an understandable reluctance of courts to strictly apply the rule to urban property, but no clearly defined alternative rule has emerged.

We believe that much of the confusion in the law regarding rules and theories is caused by a failure to ascertain whether water doctrine arises under property or tort law. It has generally been assumed heretofore that the rules relative to surface waters are a branch of property law. This classification undoubtedly results from the fact that most controversies over private waters arise between adjoining landowners and nearly always involve invasions of interests in land rather than interests in personalty or chattels. The consequence is that the legal relations of the parties have been stated almost invariably in terms of property concepts, such as rights, privileges, servitudes, natural easements, etc.

As pointed out by Kinyon and McClure in their article, *supra,* 24 Minnesota Law Review 891, at page 936, "There is no question, however, that one's liability for inter-

fering with surface waters, when incurred, is a tort liability. An unjustified invasion of a possessor's interest in the use and enjoyment of his land through the medium of surface waters, or any other type of waters, is as much a tort as a trespass or a private nuisance produced by smoke or smells.'

Such words as "right," "servitude," and "easement" connote a state that is fixed and definite, and they cannot be applied in those terms to describe flexible legal relations dependent upon varying circumstances. Thus, Kinyon and McClure, *supra,* at page 939, indicate that while tort terminology is not necessarily a panacea, a court is more likely to produce an acceptable result if it analyzes "prerequisites of liability" rather than merely the "rights of the parties."[8]

Some California courts have used negligence principles with salutary results. *Coombs* v. *Reynolds* (1919) 43 Cal.App. 656 [185 P. 877], is an example of the issue being submitted to the jury as to whether the defendants tilled and cultivated their lands in a careful and prudent manner. Again, in *Jones* v. *California Development Co.* (1916) 173 Cal. 565, 574 [160 P. 823, L.R.A. 1917C 1021], a case involving flood waters, the court held: "the test of the doer's legal liability is: Was the particular act which he did reasonable in view of the existing circumstances?" Comment in 8 California Law Review (1919) 197, 200, suggests that urban area water problems are "solved in satisfactory manner by the test of reasonableness."

We find the law in California, both as to urban and rural areas, to be the traditional civil law rule which has been accepted as the basis of harmonious relations between neighboring landowners for the past century. But no rule can be applied by a court of justice with utter disregard for the peculiar facts and circumstances of the parties and properties

---

[8]Two Virginia cases illustrate the distinction. In *Norfolk & W. R. Co.* v. *Carter* (1895) 91 Va. 587, 592-593 [22 S.E. 517], the court said: "This *right* in regard to surface water may not be exercised wantonly, unnecessarily, or carelessly; but is modified by that golden maxim of the law, that one must so use his own property as not to injure the *rights* of another. It must be a reasonable use of the land for its improvement or better enjoyment, and the *right* must be exercised in good faith, with no purpose to abridge or interfere with the *rights* of others, and with such care with respect to the property that may be affected by the use or improvement as not to inflict any injury beyond what is necessary. Where the exercise of the *rights* is thus guarded, although injury may result to the land of another, he is without remedy." (Italics added.)

In *Raleigh Court Corp.* v. *Faucett* (1924) 140 Va. 126, 134 [124 S.E. 433], the court expressed the legal relations of the parties in this manner: "The law of this state . . . as to surface waters . . . imposes upon the lower landowner the duty of so using his land as not needlessly or negligently to injure the upper owner of the enjoyment of his property."

involved. No party, whether an upper or a lower landowner, may act arbitrarily and unreasonably in his relations with other landowners and still be immunized from all liability.

 It is therefore incumbent upon every person to take reasonable care in using his property to avoid injury to adjacent property through the flow of surface waters. Failure to exercise reasonable care may result in liability by an upper to a lower landowner. It is equally the 'duty of any person threatened with injury to his property by the flow of surface waters to take reasonable precautions to avoid or reduce any actual or potential injury.

If the actions of both the upper and lower landowners are reasonable, necessary, and generally in accord with the foregoing, then the injury must necessarily be borne by the upper landowner who changes a natural system of drainage, in accordance with our traditional civil law rule.

In the total spectrum of American case law, California may be considered a devotee of a modified civil law rule. Our rule has the advantage of predictability, in that responsibility for diversion of surface waters is fixed, all things being relatively equal. On the other hand, we cannot permit certainty of liability to be an excuse for tolerating unreasonable conduct by any landowners in modern society, whether they be upper or lower, urban or rural. Consistent and wise application of the California rule encourages profitable and enjoyable use of property, and provides a basis for mutual resolution of problems caused by errant surface waters.

We reiterate that the question is not one of strict negligence accountability, although we agree generally with Justice Molinari in the District Court of Appeal opinion in this case (*Keys* v. *Romley* (Cal.App.) 43 Cal.Rptr. 683, 690) that "an owner should not escape liability when he is negligent." The question is reasonableness of conduct.

What constitutes reasonable conduct is not always easy to ascertain. Justice Fleming, in the District Court of Appeal opinion in *Pagliotti* v. *Acquistapace* (Cal.App.) 46 Cal.Rptr. 533 (see our opinion, *post*, p. 873 [50 Cal.Rptr. 282, 412 P.2d 438]), suggested an upper owner could act reasonably while concentrating, accelerating and increasing the water flowing onto a lower owner's lands, and that a lower owner might dam and embank his property to repel surface waters and still be acting "in a reasonable manner to further his legitimate interests." But the question of reasonableness of conduct is not related solely to the actor's interest, however

legitimate; it must be weighed against the effect of the act upon others. (For a discussion of the elements of liability, see Rest., Torts, §§ 822-833.)

The issue of reasonableness becomes a question of fact to be determined in each case upon a consideration of all the relevant circumstances, including such factors as the amount of harm caused, the foreseeability of the harm which results, the purpose or motive with which the possessor acted, and all other relevant matter. (*Armstrong* v. *Francis Corp.* (1956) *supra,* 20 N.J. 320.) It is properly a consideration in land development problems whether the utility of the possessor's use of his land outweighs the gravity of the harm which results from his alteration of the flow of surface waters. (*Sheehan* v. *Flynn* (1894) 59 Minn. 436 [61 N.W. 462, 26 L.R.A. 632].) The gravity of harm is its seriousness from an objective viewpoint, while the utility of conduct is its meritoriousness from the same viewpoint. (Rest., Torts, § 826.) If the weight is on the side of him who alters the natural watercourse, then he has acted reasonably and without liability; if the harm to the lower landowner is unreasonably severe, then the economic costs incident to the expulsion of surface waters must be borne by the upper owner whose development caused the damage. If the facts should indicate both parties conducted themselves reasonably, then courts are bound by our well-settled civil law rule.

We turn now to the issue of damages and to the appropriate disposition of this case.

Defendants contend that the award of damages arising after the filing of the suit was in error because that issue was not tried. They urge that damages be reduced to the amount suffered up to April 27, 1960, the date the complaint was filed.

At trial defendants made timely objection to testimony of injuries suffered subsequent to April 27, 1960, and they now contend the court ruled that such testimony was admitted only as to the injunction. When the objection was made, plaintiffs' counsel argued that the damage in this case was matter covered by the original complaint. He asked the court if plaintiffs would have to file a new complaint for each flooding incident. The court replied, ''No, I don't suppose he would. In fact, I suppose that would be covered by that rather—what we call now leading case that was tried in this department, that it is not necessary to file subsequent claims. . . . However, gentlemen, you will have an opportunity to file points and authorities on this, or briefs.''

█ The issue was briefed and argued, and the ultimate ruling of the trial court in favor of plaintiffs on that issue was correct. Section 3283 of the Civil Code provides that "Damages may be awarded . . . for detriment resulting after the commencement [of the action]." (See also *Bellman* v. *County of Contra Costa* (1960) 54 Cal.2d 363 [5 Cal.Rptr. 692, 353 P.2d 300].) Moreover, it is apparent that defendants' contention that the issue was not tried is inaccurate.

█ The remaining question is the appropriate means of disposing of this case in view of the state of the law. It may be assumed that if reliance upon existing law motivated the conduct of the parties, they were guided by the civil law rule. On the other hand, as we have indicated, consideration must be given to standards of reasonableness, and the appealing defendants should not be denied an opportunity to defend their acts on that basis. The injuries complained of only began to occur here after plaintiffs removed the dirt pile from the rear of their property and the defendants changed the contours of their own property. These acts must be weighed, and the court should make a finding on the issue of reasonableness.

The judgment is reversed and the cause is remanded with directions to the trial court to redetermine the issues in conformity with the views herein expressed. The parties are to bear their own costs on appeal.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Peek, J., and Burke, J., concurred.