Filed 5/16/14

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| W&W EL CAMINO REAL, LLC,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>VICTORIA FOWLER, as Trustee, etc.,<br><br>    Defendant and Respondent. | D062977<br><br><br><br>(Super. Ct. No. 37-2010-00063515-CU-OR-NC) |

APPEAL from a judgment of the Superior Court of San Diego County, Thomas P. Nugent, Judge.  Reversed.

Blanchard, Krasner & French, A. Kipp Williams and Luke J. Jana for Plaintiff and Appellant.

Lucas & Haverkamp Law Firm, Stephen D. Lucas and Patricia Jo Custer for Defendant and Respondent.

Plaintiff and appellant W&W El Camino Real, LLC (W&W) sued its upslope neighbor, defendant and respondent Victoria Fowler, trustee of the Fowler Revocable Living Trust (Fowler), for property damages after a January 2010 severe rainstorm flooded the property currently owned by W&W with water, mud and debris over the course of several

hours, and which W&W contends originated from Fowler's property. Fowler owns several acres of real property located in Rancho Santa Fe, California. For many years Fowler has operated a lemon grove on about four of those acres consisting of about 450 trees.

The jury in the special verdict form found in favor of W&W and awarded it about $350,000 in damages. However, the jury also found Civil Code[1] section 3482.5, also known as the "Right to Farm Act," applied. Under that statute, a commercial agricultural activity conducted for more than three years consistent with accepted standards in the locality is deemed not to be a nuisance due to any changed condition in the locality if the activity did not constitute a nuisance when it began. (See *Souza v. Lauppe* (1997) 59 Cal.App.4th 865, 868 (*Souza*).) As a result of the jury's finding that section 3482.5 applied, W&W's damage award was nullified.

On appeal, W&W contends the trial court erred by allowing Fowler to amend her answer on the day trial was to begin to assert the defense of section 3482.5. W&W alternatively contends that section 3482.5 does not apply in this case and that the jury's findings in the special verdict are contradictory and irreconcilable.

As we explain, we conclude on this record that the trial court did not abuse its discretion when it allowed Fowler to amend her answer to assert the defense of section 3482.5.

---

[1]     All further statutory references are to the Civil Code unless noted otherwise.

However, we also conclude that the issue of whether section 3482.5 applied in this case should have been teed-up first in the special verdict form *before* the jury reached the issue of negligence/comparative fault of the parties because that verdict, as it now stands, is hopelessly inconsistent. We further conclude on remand the activity and/or operations alleged to be the nuisance and the nuisance itself should be defined for the jury in order for it to determine whether such activity or operations was an "agricultural activity, operation, or facility, or appurtenance thereof" within the meaning of section 3482.5.

We thus reverse the judgment in favor of defendant Fowler and remand the matter for a new trial consistent with the principles discussed in this opinion.

FACTUAL AND PROCEDURAL BACKGROUND

In 1981, Fowler purchased real property in Rancho Santa Fe, which included an avocado grove. In the late 1980's, Fowler paid a professional citrus grove company, R.E. Badger & Son, Inc. (Badger), $26,400 to remove the nearly dead avocado grove and plant about 450 lemon trees (lemon grove) on about four acres of the real property. In the early 1990's, Badger subsequently installed a drainage and erosion control system (drainage system), designed by a soils engineer, in the center of the lemon grove. The drainage system consisted of a 12-inch corrugated plastic pipe that exited about three feet from W&W's property line. Until the damage at the heart of this lawsuit, which occurred in 2010, Fowler was unaware of the existence of the drainage system in her lemon grove.

3

Badger is a family-run business that has been working in the agriculture industry in the Rancho Santa Fe area for decades and, at one point, managed over 1,000 acres of groves in the area, comprised mainly of oranges but also avocados and lemons. At the time of trial, Badger was still managing and operating the lemon grove. One of the individuals who owned and operated the company, Charles E. Badger, Sr., testified that while managing the lemon grove he never received any complaints from any owner of property located downhill from Fowler's property related to the lemon grove, including any complaint about water runoff.

In about 2005, W&W purchased for $1.5 million vacant land located to the east of, and downhill from, the lemon grove (W&W property). W&W purchased the W&W property to construct a new home to sell. W&W hired a contractor to build the house, which W&W eventually sold for $8.2 million in mid-2008 to the Yde Family. The Ydes eventually fell behind on the loan payments, and W&W in response took back the W&W property.

On a day in mid-January 2010 the area comprising the lemon grove and the W&W property experienced heavy rains. In fact, Charles E. Badger, Sr., testified as an expert on Fowler's behalf that, on the day of the flood, the area experienced three inches of rain, which he described as a "massive sudden rainfall occurrence that happened in just a few hours." As a result, a "substantial amount of water" was released through the outlet pipe of the drainage system.

4

According to W&W's operative complaint, the "water traveled at great force and at a high velocity, taking dirt and landscaping with it, ultimately rushing onto the W&W property and resulting in water and mud flowing down the hill and flooding the W&W property," severely damaging that property, the newly constructed house on it and its contents. At the time of the flooding, the W&W property was owned and occupied by the Ydes.

Before the mid-January 2010 flooding, the only problem related to water and mud intrusion in connection with the W&W property was a single instance during construction of the home in which some dirt from a planter box that was not yet planted, located above the pool, ran into the pool located on the W&W property after a rain storm. The pool company cleaned the pool and removed the dirt.

Otherwise, based on the testimony of Fowler, Charles E. Badger, Sr., Stewart Weissman, who along with his partner purchased the W&W property in or about 2005, the contractor, James Sylvester, who built the house on the W&W property during a two-year period, and William Yde, the owner that purchased the W&W property from W&W, there is no evidence any water, mud and debris from the lemon grove had run onto the W&W property before the January 2010 incident that is the subject of this lawsuit.

Yde testified he and his wife were on their way to Los Angeles on the day of the flooding when their children called and told them water was coming into their house. After arriving in Los Angeles and sleeping for a few hours, Yde left and drove back home, only to find water and mud "all over the place" inside their new home. He stated it was a "disaster,"

5

and when he arrived home about five or six hours after the telephone call, there was still water flowing into the house.

Yde stated he went outside and could hear and see the water coming from up the slope. As he went up the slope, he saw "water and mud and stuff coming out of the pipe" from the lemon grove. According to Yde, there was no erosion on the W&W property.

The day after the flooding, Weissman visited the W&W property to inspect the damage. Weissman confirmed there was no erosion on the W&W property. However, he stated that the brow ditch built on the W&W property was completely filled with "silt and mud and dirt," and that the pool and spa were full of mud, which in turn ruined the pool equipment. Weissman also saw "lots of lemons, leaves and twigs" in the backyard of the W&W property, including many lemons floating in the pool. There also was mud and water inside the master bedroom, the library and what Weissman referred to as the "great room." The mud, water and debris also flowed down the long hallway inside the house into three bedrooms and down a staircase into the garage and the media room. The water and mud ruined the furniture, the flooring and drapes in these rooms. As a result of the flooding, the Ydes were forced to move from the house.

W&W's expert, Ivan Fox, a licensed civil engineer and general engineering contractor, testified the majority of the soil that flowed onto and damaged the W&W property originated from the Fowler property and in particular from the lemon grove, which Fox noted included substantial barren land between the trees because the Badgers regularly

6

sprayed a weed killer to keep the lemon grove weed-free. Fox also testified the drainage system in the lemon grove on the day of the flood worked as it was supposed to in terms of moving water from one location to another, but testified the problem with the drainage system was it picked up a lot of soil from the "barren" lemon grove that exited the pipe, filled up the brow ditch on the W&W property and subsequently flowed with the rainwater onto the W&W property.

Fox also testified the pipe from the drainage system was placed too close to the W&W property. Instead of three or four feet from the end of the pipe to the W&W property, Fox opined the pipe should have been at least 15 feet away from the property line in order to slow down or take the "energy out of the [water in the] pipe. That's to slow it down—to reduce the velocity. It's called energy dissipator." Fox further explained that there were many ways to slow down the water from the pipe before it was delivered onto the W&W property, but the most common method would have been to use large rocks, a practice called "riprap."

Thus, Fox opined that rocks should have been placed at the outlet of the pipe "to slow the water down" and that three or four feet was not an "adequate distance to do that. You would probably need at least 15 feet."

Fowler's expert, Dennis Bowling, a licensed civil engineer and a registered professional engineer, testified that the lemon grove was shaped like a "bowl" and that drainage from it naturally flowed towards the downslope property of W&W. Bowling

7

further testified that the house W&W built on its property was "right in the middle of the drainage swale from the Fowler grove."

Bowling opined Fowler made a lot of improvements to the lemon grove to minimize onsite erosion, including adding berms on the access roads that diverted the water to a grassy area; building a number of berms in the lemon grove itself to slow the water down; and constructing the drainage system, which provided for drainage on the lemon grove while at the same time allowing for "ponding upstream" to ensure water did not concentrate and cause erosion.

Bowling also opined the brow ditch built by W&W in connection with the construction of its home was inadequate because it was too small, was not lined with the right material (i.e., grass or concrete) and was inadequately sloped to convey water offsite. Finally, Bowling opined the source of dirt that damaged the W&W property was consistent with material from a flower bed or from "local landscaping" because it appeared to be "very dark organic material," which material was inconsistent with the "sandy material" one would expect to find from a "mature grove" such as the lemon grove in this case.

W&W took responsibility for cleaning the house and the property, which took several months. W&W in its operative complaint alleged that the flooding caused over $550,000 in damage to the home and swimming pool and more than $50,000 in damage to the contents in the home, among other damages. At trial W&W sought damages in excess of $900,000.

8

After W&W took back ownership of the property, it sued Fowler for negligence, nuisance, trespass and an injunction. As noted, by special verdict the jury found that Fowler was not reasonable in the control and ownership of her property; that W&W also was not reasonable in the control and ownership of its property; that Fowler's conduct in the ownership and control of her property caused W&W damage; and that W&W was damaged in the amount of about $350,000. However, the jury also found section 3482.5 applied. As a result, the court entered judgment for Fowler.

DISCUSSION

I

*Amending the Answer*

W&W initially contends the trial court erred when it allowed Fowler to amend her answer on the date trial was to start to allege the defense of section 3482.5. We disagree.

Here, the record shows the trial court granted Fowler's motion to amend only after W&W filed a written opposition to the motion. In addition, after the trial court granted the motion to amend, it vacated the trial date and reopened discovery. In response W&W conducted additional discovery, including taking a second deposition of Fowler and designating and deposing additional experts.

"Code of Civil Procedure section 473, subdivision (a)(1) permits a court, 'in furtherance of justice,' to 'allow a party to amend any pleading . . . in any . . . respect.' The trial court's ruling on a motion to amend a pleading is reviewed under an abuse of discretion

9

standard [citation], and the appellant has the burden of establishing its discretion was abused. [Citation.] Generally, 'the trial court has wide discretion in determining whether to allow the amendment, but the appropriate exercise of that discretion requires the trial court to consider a number of factors: "including the conduct of the moving party and the belated presentation of the amendment. [Citation.]" ' " (*Emerald Bay Community Assn. v. Golden Eagle Ins. Corp.* (2005) 130 Cal.App.4th 1078, 1097, italics omitted.)

"In the furtherance of justice, trial courts may allow amendments to pleadings and if necessary, postpone trial. . . . Motions to amend are appropriately granted *as late as the first day of trial* [citation] *or even during trial* [citation] if the defendant is alerted to the charges by the factual allegations, no matter how framed [citation] and the defendant will not be prejudiced." (*Honig v. Financial Corp. of America* (1992) 6 Cal.App.4th 960, 965, italics added; see also *P&D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332, 1345 [noting courts "must apply a policy of liberality in permitting amendments at any stage of the proceeding, including during trial, when no prejudice to the opposing party is shown"].)

Here, on this record, we conclude W&W has failed to make an adequate showing of prejudice, particularly given the court continued the trial for more than 90 days and W&W was afforded an additional opportunity to conduct discovery, including deposing Fowler a second time and designating and deposing additional experts. We thus conclude the trial court did not abuse its discretion under Code of Civil Procedure section 473 when it granted

10

Fowler's motion to amend her answer. (See *Bedolla v. Logan & Frazer* (1975) 52 Cal.App.3d 118, 135-136 [noting that "[w]hile under section 473 of the Code of Civil Procedure and the case authorities pertaining thereto the trial court has wide discretion in allowing the amendment of any pleading [citations], as a matter of policy the ruling of the trial court in such matters will be upheld unless a manifest or gross abuse of discretion is shown"]; see also *Berman v. Bromberg* (1997) 56 Cal.App.4th 936, 945 [noting a court should grant a motion to amend a pleading to state a legal theory not previously pleaded, but related to the same general set of facts as the previously pleaded theories, if the opposing party would not be prejudiced by the amendment].)

II

*Section 3482.5*

A. Guiding Principles

Subdivision (a)(1) of section 3482.5 provides: "No agricultural activity, operation, or facility, or appurtenances thereof, conducted or maintained for commercial purposes, and in a manner consistent with proper and accepted customs and standards, as established and followed by similar agricultural operations in the same locality, shall be or become a nuisance, private or public, due to any changed condition in or about the locality, after it has been in operation for more than three years if it was not a nuisance at the time it began."

11

Subdivision (e) of section 3482.5 defines the term "agricultural activity, operation, or facility, or appurtenances thereof" to "include, but not be limited to, the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural commodity including timber, viticulture, apiculture, or horticulture, the raising of livestock, fur bearing animals, fish, or poultry, and any practices performed by a farmer or on a farm as incident to or in conjunction with those farming operations, including preparation for market, delivery to storage or to market, or delivery to carriers for transportation to market."

"For section 3482.5, subdivision (a)(1) to apply, defendants must satisfy seven requisites: The activity alleged to be a nuisance must be (1) an agricultural activity (2) conducted or maintained for commercial purposes (3) in a manner consistent with proper and accepted customs and standards (4) as established and followed by similar agricultural operations in the same locality; the claim of nuisance arises (5) due to any changed condition in or about the locality (6) after the activity has been in operation for more than three years; and the activity (7) was not a nuisance at the time it began." (*Souza*, *supra*, 59 Cal.App.4th at pp. 874-875.)

This court in *Rancho Viejo v. Tres Amigos Viejos* (2002) 100 Cal.App.4th 550 (*Rancho Viejo*) upheld the grant of summary judgment in favor of the defendant avocado farmer after irrigation water from its farm allegedly caused property damage to the plaintiff residential developer. There, a landowner owned 500 acres of real property in North

12

San Diego County.  In 1997, the landowner sold to the plaintiff a portion of this real property for residential development (lower property).  The landowner retained ownership of the adjacent property, which contained an orange grove and an avocado grove consisting of about 6,600 trees that, since the mid-1970's, had been commercially farmed on a continuous basis (upper property).  (*Id.* at pp. 555-556.)

In 1998, the landowner sold the upper property to the defendant, whose business consisted only of commercial avocado farming.  The defendant continued to irrigate the upper property "in a manner identical to the way it was irrigated before its purchase." (*Rancho Viejo*, *supra*, 100 Cal.App.4th at p. 557.)  However, in mid-1999, after the plaintiff had completed grading on the lower property, the plaintiff "discovered water cascading and seeping from the cut slopes in various lots as a result of [the defendant's] irrigation of the upper property, causing damage to and destabilization of the slope.  [The plaintiff] requested [the defendant] solve the problem by either reducing its irrigation or installing water control systems to prevent the runoff."  (*Ibid.*)  When the defendant refused, the plaintiff installed a subdrain system and sued the defendant for trespass and nuisance, seeking damages and injunctive relief.  (*Ibid.*)

Relying in part on *Souza*, the *Rancho Viejo* court concluded that section 3482.5 barred the plaintiff's nuisance and trespass causes of action.  (See *Rancho Viejo*, *supra*, 100 Cal.App.4th at p. 557.)  In so doing, the court recognized that the owner of the lower

13

property "does not, nor could it reasonably, argue that irrigation is not an agricultural activity or operation." (*Id.* at p. 560.)

The court in *Rancho Viejo* rejected the contention of the owner of the lower property that section 3482.5 applied only to a cause of action for nuisance and not to a cause of action for trespass: "Construing the statute in light of its legislative purpose compels us to reject a narrow reading that would turn upon the pleaded theory of liability, and adopt a reading that would further the preservation of ongoing, standard agricultural practices. If commercial agricultural activity qualifies as a nuisance and otherwise falls within section 3482.5, a plaintiff cannot avoid the immunity provided by the statute by simply recharacterizing or relabeling the conduct in the guise of trespass to bring it outside the ambit of the statute. This was implicitly recognized by the court of appeal in *Souza*, *supra*, 59 Cal.App.4th 865, where the trial court treated a complaint alleging causes of action for negligence and unlawful business practices in violation of Business and Professions Code section 17200 et seq. as in fact based on a theory of nuisance because they alleged the violation of a single primary right, 'i.e., plaintiffs' right to the unimpaired ownership and undisturbed enjoyment of their premises.' (*Souza*, at p. 870.) *Souza* involved irrigation, the very agricultural activity involved here, except as to rice crops. For approximately five years, the parties, commercial farmers with bordering farm lands, farmed rice on their land. (*Id.* at p. 869.) After the plaintiffs shifted to planting row crops, they noticed when defendants' rice fields were flooded, the portion of their land closest to the defendants' became so wet that it could

14

not be farmed. (*Ibid.*) The plaintiffs sued defendants, seeking an injunction and damages for negligence and unfair business practices, and the defendants successfully moved for summary judgment on the ground plaintiffs' lawsuit was barred by section 3482.5. (*Souza*, at pp. 870-871.) The issue before the appellate court in *Souza* was whether the statute applied to an action against a commercial entity by another commercial entity as opposed to a non-agricultural plaintiff; the court concluded the statute's language was unambiguous and broadly applied to such circumstances. (*Souza*, at pp. 873-874.)

"Appellant seeks to distinguish *Souza* on the basis that the invasion, the flooding of rice crops, was continuing in nature whereas here, the water intrusion occurred only when respondent irrigated its land. The distinction is baseless. Irrigation is an ongoing operation in commercial farming generally, and was regularly conducted in this case according to the undisputed testimony of respondent's irrigation worker, Salvador Munoz. Even where the watering is an occasional leaching, it is still a practice that is repeated on a regular basis. As for appellant's other attempts to distinguish *Souza*, we agree the case does not address the precise issue before us. But we need not rely upon *Souza* for this aspect of our holding; we independently support our conclusion by the undisputed facts of this case revealing that appellant's causes of action alleging property damage from irrigation water intrusion fall within the literal language of the statute." (*Rancho Viejo*, *supra*, 100 Cal.App.4th at pp. 563-564, fn. omitted.)

The lower property owner in *Rancho Viejo* contended that section 3482.5 did "not apply to situations where a farmer subdivides his or her land and initiates the urbanization of portions of the property but continues to conduct agricultural activities on the remainder." (*Rancho Viejo*, *supra*, 100 Cal.App.4th at p. 565.) The *Rancho Viejo* court refused to address this "broad question" and instead focused on the facts in the record showing that while the landowner initially "sold the upper and lower properties cognizant of the lower property's possible urbanization, in fact it was the appellant that took the steps to begin mass urban development, initiating the feasibility study for the proposed residential development even before it purchased the lower property. It is further undisputed that it was the appellant who, after purchasing the lower property, removed orange groves that had been present for at least 30 years and excavated the cut slopes. Appellant admitted that before excavation, that property 'was used for the agricultural purpose of a commercial orange grove.' By virtue of these acts, appellant changed the condition of the lower property. Importantly, it is undisputed that the water intrusion problems occurred at the location of the slopes, and appellant has failed to contradict with any competent evidence the fact that its nuisance cause of action—*seeking damages resulting from the water intrusion*—did not accrue until it graded the slopes below the respondent's avocado grove. Finally, appellant fails to present competent evidence disputing the fact that respondent has not changed the watering practices

16

of the upper property that had been in place since at least 1982.[2]" (*Rancho Viejo*, *supra*, 100 Cal.App.4th at pp. 565-566, italics added.)

The *Rancho Viejo* court also rejected the contention of the lower property owner that a triable issue of fact existed regarding the " 'reasonableness' of the parties' respective actions under the 'Civil Law Rule' expressed in *Keys v. Romley* (1966) 64 Cal.2d 396, 409-410.[3]"

---

2    "Respondent submitted the declaration of Salvador Munoz, who began working on the upper property in 1975 and who at the time of the motion was the person in charge of watering the avocado groves on the upper property. He averred he has been involved in watering the avocado groves since 1982 and that the grove has been irrigated since then on a regular basis. Munoz continued: 'The amount of water varies depending on the temperature, rainfall, and needs of the trees. The only thing that has changed is who pays my paycheck. Today I am still in charge of watering [the upper property], and we do nothing different than we did in the past.' In an attempt to counter that fact, respondent submitted the deposition testimony of Walter George, who stated he observed more surface water coming off the avocado groves from the upper property in 1999 than he had in 1998, when appellant was conducting grading operations. George's testimony does not address the watering practices of the upper property; indeed he indicated during the deposition that he had 'no idea' of respondent's watering schedule. His testimony does not raise a disputed issue as to the fact respondent's watering practices, which may vary as a result of certain conditions including rainfall, are in any event consistent with watering practices that have been conducted since 1982."

3    "In *Keys v. Romley*, the court explained that under this rule, 'the owner of an upper, or dominant, estate is entitled to discharge surface water from his land as the water naturally flows. As a corollary to this, the upper owner is liable for any damage he causes to adjacent property by the discharge of water in an unnatural manner. In essence, each property owner's duty is to leave the natural flow of surface water undisturbed.' (*Keys v. Romley*, *supra*, 64 Cal.2d at pp. 405-406; see also *Gdowski v. Louie* (2000) 84 Cal.App.4th 1395, 1402.) However, in areas that are both rural and urban, the court held a modified rule should be applied that focuses on the reasonableness of each parties['] conduct. (*Keys v. Romley*, 64 Cal.2d at pp. 408-409.) Subsequent cases have summarized the rules laid down in *Keys v. Romley* as follows: ' "1. If the upper owner is reasonable and the lower owner unreasonable, the upper owner wins; 2. If the upper owner is unreasonable and the lower owner reasonable, the lower owner wins; and 3. If both the upper and lower owner are reasonable, the lower

17

(*Rancho Viejo*, *supra*, 100 Cal.App.4th at pp. 569-570.) Specifically, the owner of the lower property argued "it acted reasonably because it consulted with engineering specialists to determine the property's suitability for development, but respondent 'has not acted reasonably in the use of its property because it is applying excessive amounts of water to its property, causing surface water to run onto the property of Appellant.'

"Reasonableness of the encroaching urban landowner's conduct is not an element of section 3482.5, and therefore whether appellant's conduct was reasonable is not material to application of the statute. The pertinent question under the statute is whether the commercial agricultural activity at issue—respondent's irrigation—is an accepted and customary practice followed by similar operations in the locale. If respondent's watering practices are unreasonable it would tend to show that they are not accepted or customary. But appellant's evidence fails to support its assertion. . . . No evidence contradicts respondent's expert's conclusion that respondent's irrigation practices are customary for avocado farmers in the locale who use well water. Appellant's evidence provides no basis for us to reverse the trial court's ruling." (*Rancho Viejo*, *supra*, 100 Cal.App.4th at p. 570.)

B. <u>Analysis</u>

Although the issue in *Rancho Viejo* involved irrigation water flowing onto the property of another that the owner of that property claimed was a nuisance and/or a trespass, while the instant case involves heavy rainwater from a storm that caused soil and water

---

owner wins also." ' (*Gdowski v. Louie*, 84 Cal.App.4th at p. 1404, quoting *Burrows v. State of California* (1968) 260 Cal.App.2d 29, 32-33.)

18

allegedly from the lemon grove to run onto and damage the W&W property, we nonetheless conclude certain principles from *Rancho Viejo* provide guidance on remand to the parties in the instant case.

First, we agree with *Rancho Viejo* that the conduct of an "encroaching" landowner (i.e., W&W in the instant case) is *not* an element of section 3482.5. (*Rancho Viejo*, *supra*, 100 Cal.App.4th at p. 570.) Thus, whether W&W acted unreasonably (and perhaps got what it deserved, as Fowler suggested at trial and throughout its briefing in this court) in not installing a concrete drainage ditch to protect the home it built from storm water damage is irrelevant to the issue of whether section 3482.5 applies in this case.

Second, unlike the issue in *Rancho Viejo* where there was no dispute that "[i]rrigation is an ongoing operation in commercial farming generally, and was regularly conducted . . . according to the undisputed testimony of respondent's irrigation worker" (*Rancho Viejo*, *supra*, 100 Cal.App.4th at p. 564), in the instant case there is a dispute between the parties regarding whether the "activity" on and/or "operation" of the lemon grove by Fowler that led to the damage on the W&W property (as alleged in its operative complaint) was an "agricultural activity, operation, or facility or appurtenance thereof" for purposes of section 3482.5. Thus, on remand the activity and/or operations alleged to be the nuisance should be defined for the jury in order for it to determine whether section 3482.5 applies.

19

Moreover, we note in *Rancho Viejo* the court defined the nuisance not as the existence of the avocado grove itself, but rather as the intrusion of water onto the plaintiff's graded property from the defendant's irrigation of the avocado groves. (See *Rancho Viejo*, *supra*, 100 Cal.App.4th at p. 566.) However, in the instant case the nuisance was *not* defined for the jury, and the record shows there was substantial disagreement between the parties throughout the trial, including in closing argument, regarding what exactly was the nuisance in this case. On remand, the nuisance should be defined for the jury in connection with its determination of whether section 3482.5 applies.

Third, the *Rancho Viejo* court specifically noted that the "pertinent question" under section 3482.5 was "whether the commercial agricultural activity at issue—respondent's irrigation—is an accepted and customary practice followed by similar operations in the locale. If respondent's watering practices are unreasonable it would tend to show that they are not accepted or customary." (See *Rancho Viejo*, *supra*, 100 Cal.App.4th at p. 570.)

Here, as noted, the jury expressly found in the special verdict that Fowler was unreasonable in the ownership and control of her property (i.e., the lemon grove) and that her unreasonable conduct caused W&W to incur damages of about $350,000. As recognized by *Rancho Viejo* (albeit in dictum), that finding suggests Fowler did *not* operate and maintain her agricultural operation or facility (i.e., the lemon grove) "in a manner consistent with proper and accepted customs and standards" (§ 3482.5, subd. (a)(1)) as required by the statute.

20

To avoid what we conclude amounts to an inconsistent special verdict requiring reversal (see *Mendoza v. Club Car, Inc.* (2000) 81 Cal.App.4th 287, 303 [noting a special verdict's correctness is subject to de novo review]; *City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 682 [noting an "appellate court is not permitted to choose between inconsistent answers"]), on remand the issue of whether section 3482.5 applies should be decided *first*, before the jury reaches the issue of negligence/comparative fault of the parties.

## DISPOSITION

The judgment is reversed, and the matter is remanded for a new trial on the issue of liability and damages.  In the interests of justice, both parties shall bear their own costs on appeal.

BENKE, Acting P. J.

WE CONCUR:

HALLER, J.

McINTYRE, J.