[No. F007104. Fifth Dist. Mar. 7, 1988.]

IRVIN A. MARTINSON et al., Plaintiffs, Cross-defendants and Respondents, v.
DAVID F. HUGHEY et al., Defendants, Cross-complainants and Appellants.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part II.

**COUNSEL**

Arthur C. Kralowec for Defendants, Cross-complainants and Appellants.

Hurlbutt, Clevenger, Long & Vortmann, Jeffery S. Nelson and David J. Wells for Plaintiffs, Cross-defendants and Respondents.

## Opinion

### BROWN (G.A.), J.*—

Defendants, cross-complainants and appellants, David F. Hughey and his wife (Hughey) appeal from a judgment entered after a six-day bench trial in favor of plaintiffs and cross-defendants Irvin A. Martinson and his wife and Robert Pokelwaldt and his wife (hereinafter respondents) enjoining Hughey from obstructing the flow of surface and irrigation water off respondents' property onto Hughey's property and awarding damages to respondents. Hughey was denied damages to his home and orchard from flooding which he sought by way of cross-complaint.

### Statement of Facts

The parties involved all lived in the foothills in the Porterville area at the lower end of a 1,700-acre watershed. The general slope of the area is from east to west. Both Martinson and Pokelwaldt (upper owners) lived to the east of Hughey (lower owners).

Attached as exhibit A is a schematic drawing, for the purpose of illustration only, which shows the general location of certain points and features. This exhibit represents the court's effort to synthesize the testimony for the purpose of visually depicting the relative physical location of pertinent features. Except for the size of the block parcels, the drawing is not to scale. All of the property involved can be viewed as composed of 10-acre squares, 660 feet by 660 feet. Hughey's 30 acres formed a rectangle, the short borders (660 feet) (D-F and G-I) lying on the east and west, the long borders (1,980 feet) (D-G and F-I) lying on the north and south sides.

Pokelwaldt also owned 30 acres, a 10-acre square immediately east of Hughey's eastern border, a 10-acre square due south and a 10-acre square due west, bordering the southeastern portion of Hughey's property. The Pokelwaldt land was doglegged, or L-shaped.

Martinson owned 20 acres next to Pokelwaldt, sharing the northern border of the Pokelwaldt property (B-D). Along with the land of Mr. Guzman (who is not involved in this litigation), lying north of Hughey and west of Martinson, the properties met at a common corner (D), the northeastern corner of the Hughey property and the northwestern and southwestern corners, respectively, of the Pokelwaldt and Martinson properties.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

And, although the general slope of the area is east to west, the Pokelwaldt property also sloped down toward the north, and the Martinson property sloped down toward the south, the lower points being toward their common border.

Hughey first purchased the lower western 10 acres in 1972. There was a house (H) sitting in the northwestern corner, and the land was planted with a citrus grove. In 1974, he bought the eastern 20 acres, also planted with citrus groves. Martinson acquired his 20-acre navel orange grove in 1975. Pokelwaldt acquired his 30 acres in 1978. It was planted partially with citrus and partially with olives.

At the time the parties acquired their interests, there remained a natural drainage course along the area of the border between the Martinson and Pokelwaldt properties (B-D). Meandering along the common border of the Martinson and Pokelwaldt property in the area of the natural drainage course was a ditch (B-D). It emptied at the northeastern corner of the Hughey property into a ditch running along the north border of the Hughey property (D-G). Along the eastern borders of the Martinson and Pokelwaldt property, running north-south, was a raised dirt road on a county easement (A-C). A ditch had been made along its eastern side (J-K). There were culverts beneath the road to permit the passage of water from the east onto the Martinson and Pokelwaldt properties.

Besides the shared natural ditch each of the Pokelwaldt and Martinson properties had an artificial ditch. Pokelwaldt's ditch drained northwest, terminating approximately at the mid-point of Hughey's eastern border. From that point, the water would drain northerly along the berm bordering Hughey's easterly property line (D-F) to the common point (D). Martinson's artificial ditch ran approximately 300 feet north of, and parallel to, the natural ditch in a westerly direction, but curved south and emptied into the corner area with the natural ditch. It would appear each of these ditches running through the Pokelwaldt and Martinson properties were but "improved" natural drainage courses. The evidence is somewhat confused and it may be that the Martinson artificial ditch actually emptied at a lower point on Hughey's northern border. During heavy rains, the water both from above the respondents' properties and the water off their properties drained in the general direction of the natural slope of the properties (See exhibit A).

The Hughey property had a raised berm which was also at times used as a farm road along the eastern border, reaching approximately three feet in height at the northeastern corner and about twelve feet in width (D-F). Testimony was not consistent about whether the berm ran the whole length

of the eastern border of Hughey's property from its initial construction in 1958 or 1959 or whether it was extended during Hughey's tenure to meet the northeastern corner. There is evidence that Hughey added to and maintained this berm at various times during his ownership. Also constructed by Hughey's predecessor in 1958 or 1959 was a ditch running the entire length of the northern border of the Hughey property (D-G north ditch). This ditch, in essence, acted as an extension of the common natural drain running between the Pokelwaldt and Martinson properties (B-D).

Also, during the relevant period, Guzman had constructed a raised road running along the eastern border of his land and the western border of Martinson's property (E-D) which ended near the corner area shared by the parties.

Thus, irrigation tail water and rain water accumulating from above the parties' properties ran in the county ditch and passed through the Pokelwaldt and Martinson properties in the artificial and natural ditches toward the artifical ditch on the Hughey property, or, in the case of the Pokelwaldt artifical ditch, toward the berm on the Hughey property which directed the water toward Hughey's artificial ditch. Similarly, irrigation tail water and rain water originating on the Pokelwaldt and Martinson properties ultimately ran toward Hughey's artificial ditch.

Except for cleaning and maintenance, the only major change in the drainage system came in 1981 when Martinson and Pokelwaldt deepened and perhaps straightened the natural common ditch between their properties (B-D).

Beginning in 1979 Hughey began to deposit dirt, debris, tires and concrete pieces at the top of the north ditch on his property. Initially, this only slowed the flow of water coming from the upper property. However, by the winter of 1981-1982 the flow of water was backed up onto the Pokelwaldt property, killing several trees. Pokelwaldt replanted. Hughey continued to pile debris in the ditch, and during the winter of 1982-1983 portions of both the groves of respondents were injured by surface water which could not flow off the property. Hughey continued to strengthen the obstruction. In March of 1984, the complaint against Hughey was filed, and, in April, a preliminary injunction was granted allowing respondents to remove the obstruction, which they did.

Hughey, in the answer to the complaint and by his cross-complaint, attempted to show justification for the obstruction. He claimed the waters coming off of the plaintiffs' property were "unnatural, excessive, and accelerated" and he had no duty to accept them. In his cross-complaint, he

sought to recover damages for the loss of his 30-acre grove and for damages to his home.

## Statement of Decision

In its statement of decision, the court, in sum, found that as to the complaint Hughey acted unreasonably in obstructing the flow of the water into the ditch along the north side of his property, resulting in damages in a specified amount to respondents on account of diminution in the value of respondents' groves and expenses. The respondents acted reasonably in managing the drainage runoff waters on their groves. The court found: "The flow of nuisance waters from the surface of Plaintiffs' properties would have all flowed into Defendants' north ditch regardless of the ditches and channels constructed by Plaintiffs on their properties. Such waters would have otherwise flowed naturally in sheets and rivulets across Plaintiffs' groves into Defendants' north [ditch]."

The court also expressly found that: "[T]he channeling of water flowing onto Defendants' land increases its velocity but not its volume, and such increase in velocity is not sufficient to cause injury to Defendants. Such channeling by the upper owner is permissible under the Civil Law Rule and the Rule of Reasonable Use where it does not increase the burden on the lower owner. *Keys vs. Romley,* 64 C.2d 396, *LaFetra vs. Richardson,* 44 CA 302, 306."

The removal of Hughey's and Guzman's embankments along the eastern border of their properties would significantly reduce the volume of water entering Hughey's north ditch.[1] The court found that the increase of velocity (not the volume of water) flowing into Hughey's north ditch did not cause injury to Hughey's land or improvements. Respondents did not alter the flow of surface or irrigation waters flowing through their groves or operate their irrigation systems in a manner permitting the discharge of tail waters to the extent that injury was caused to Hughey's land and improvements. Except for the straightening and deepening of the ditch on or near the property line between the Martinson and Pokelwaldt's properties, the other artificial ditches on those properties and the artificial ditch bordering the eastern side of the county road and the artificial ditch along the north edge of the Hughey property as well as the berm along the eastern border of Hughey's property were in existence before respondents purchased their respective properties. With regard to the north ditch, the natural drainage

---

[1] It is significant to note that the embankment constructed by Hughey's predecessor at the east end of his property and the embankment at the east end of Guzman's property prevented the waters from the Martinson and Pokelwaldt properties from leaving those properties other than at the mouth of Hughey's north ditch.

of the surface waters onto Hughey's property was changed by Hughey's predecessor, Lester Altermatt, in 1958 on or about which time the north ditch was constructed. Prior to that time, such waters flowed through defendants' grove. With respect to the artificial ditch solely on the Martinson property and the artificial ditch solely on the Pokelwaldt property, it was not established precisely when the original channeling was done except that in the mid-1960's these drainage ditches were on the plaintiffs' groves and the drainage discharged at the north ditch.

### DISCUSSION

### I

Before discussing the specific points argued by Hughey, it will be helpful to discuss and clarify the legal principles of liability applicable to upper and lower owners with regard to surface waters and other waters variously described as irrigation runoff, tail waters or nuisance waters.

The term surface waters has been defined as: "Water diffused over the surface of land, or contained in depressions therein, and resulting from rain, snow, or which rises to the surface in springs, is known as 'surface water.' It is thus distinguishable from water flowing in a fixed channel, so as to constitute a watercourse, or water collected in an identifiable body, such as a river or lake. The extraordinary overflow of rivers and streams is known as *'flood water'*" (*Keys* v. *Romley* (1966) 64 Cal.2d 396, 400 [50 Cal.Rptr. 273, 412 P.2d 529].)

While irrigation runoff is not included within the technical definition of surface water, in this case we are concerned with both surface and tail waters. During the rainy season, rain water would predominate. During the irrigation season, tail water predominated. We begin by discussing *Keys* v. *Romley, supra,* 64 Cal.2d 396, the last Supreme Court word on this subject which dealt with surface waters.

The civil law rule in its pure form provides a servitude or easement for natural drainage "so that the lower owner must accept the surface water which drains onto his land but, on the other hand, the upper owner has no right to alter the natural system of drainage so as to increase the burden." (*Id.* at p. 402.)

California, finding it unreasonable to apply the civil law doctrine in its rigid form, has adopted the civil law rule as modified by the doctrine of *"reasonable use* which attempts to determine the rights of the parties with respect to the disposition of surface waters by an assessment of all the

relevant factors." (*Id*. at p. 403.) This application is in accord with the modern trend toward adoption of the reasonable use doctrine, or at least, an overlay of the reasonable use analysis upon the past rule applied by the jurisdiction. (Annot., Modern Status of Rules Governing Interference With Drainage of Surface Waters (1979) 93 A.L.R.3d 1193, 1198-1199.)

Quoting further from the *Keys* decision, the court announced: "We find the law in California, both as to urban and rural areas, to be the traditional civil law rule which has been accepted as the basis of harmonious relations between neighboring landowners for the past century. But no rule can be applied by a court of justice with utter disregard for the peculiar facts and circumstances of the parties and properties involved. No party, whether an upper or a lower landowner, may act arbitrarily and unreasonably in his relations with other landowners and still be immunized from all liability.

"It is therefore incumbent upon every person to take reasonable care in using his property to avoid injury to adjacent property through the flow of surface waters. Failure to exercise reasonable care may result in liability by an upper to a lower landowner. It is equally the duty of any person threatened with injury to his property by the flow of surface waters to take reasonable precautions to avoid or reduce any actual or potential injury.

．　．　．　．　．　．　．　．　．　．　．　．　．　．　．　．　．　．　．　．

"In the total spectrum of American case law, California may be considered a devotee of a modified civil law rule. . . .

"We reiterate that the question is not one of strict negligence accountability, although we agree generally with Justice Molinari in the District Court of Appeal opinion in this case (*Keys* v. *Romley* (Cal.App.) 43 Cal.Rptr. 683, 690) that 'an owner should not escape liability when he is negligent.' The question is reasonableness of conduct." (*Id*. at pp. 408-409.)

The court went on to explain: "The issue of reasonableness becomes a question of fact to be determined in each case upon a consideration of all the relevant circumstances, including such factors as the amount of harm caused, the foreseeability of the harm which results, the purpose or motive with which the possessor acted, and all other relevant matter. [Citation.] It is properly a consideration in land development problems whether the utility of the possessor's use of his land outweighs the gravity of the harm which results from his alteration of the flow of surface waters. [Citation.] The gravity of harm is its seriousness from an objective viewpoint, while the

utility of conduct is its meritoriousness from the same viewpoint. [Citation.] If the weight is on the side of him who alters the natural watercourse, then he has acted reasonably and without liability; if the harm to the lower landowner is unreasonably severe, then the economic costs incident to the expulsion of surface waters must be borne by the upper owner whose development caused the damage. If the facts should indicate both parties conducted themselves reasonably, then courts are bound by our well-settled civil law rule." (*Id.* at p. 410.)

The court pointed out that the principle of reasonable use is based more upon concepts of tort liability than upon traditional concepts of property law. (*Id.* at pp. 408-409.)

■ Turning to the problems created by irrigation tail water, it has long been recognized that it is desirable to level and improve land to make it fit for cultivation including the construction of artificial systems to irrigate and drain the land. *(Coombs* v. *Reynolds* (1919) 43 Cal.App. 656, 659 [185 P. 877].)

In *Cheesman* v. *Odermott* (1952) 113 Cal.App.2d 26, 28 [247 P.2d 594], appellants argued: "[T]he position that the waters which respondents are causing to flow across the lands of appellants are waters which are artifically obtained and that therefore respondents should be enjoined from discharging the same into the stream in such quantities as to result in this water flowing across the lands of appellants. They quote from 27 Ruling Case Law 1151, section 79, a statement that under both civil and common law while water which naturally flows across land may continue to do so without subjecting the upper owner to any liability, yet the servitude which the owner of higher adjoining land has upon lower land for the discharge of *surface water* naturally flowing on the lower land from the dominant estate, extends only to surface water arising from natural causes such as rain and snow and cannot be augmented or made more burdensome by the acts or industry of man." The court answered: "Whatever the rule may be in other jurisdictions, we think that in California it has been modified to fit the necessities of a people who must depend greatly on irrigation. It has been declared that 'the maxim sic utere tuo ut alienum non laedas, which is incorporated in the statute law of this state . . . , implies that one may make any use which he pleases of his own so long as he does not injure others.' [Citation.] And 'The right to use a natural channel as a temporary conduit or as a drain for artificial flow has been frequently upheld. See cases digested in note, 89 A.L.R. 210.' (*Stevens* v. *Oakdale Irr. Dist.* [1939], 13 Cal.2d 343, 352 [90 P.2d 58].) 'The California Constitution, article XIV, section 3, declares that the general welfare requires that the water resources of the state be put to beneficial use to the fullest extent possible. . . . The

mandates of this section "apply to the use of all water, under whatever right the use may be enjoyed." . . . Since foreign waters may be produced for beneficial use . . . , and a natural channel may be used as a conduit or drain for the flow of such waters . . . , and since the use of such foreign waters, as long as it does not interfere with the rights of another, is of no concern to such other . . . , it follows that a noninjurious and reasonable use by defendants of the waters imported upon their lands and allowed to drain into Little Chico Creek is within the protection of the Constitution and may not be enjoined.' [Citation.] We think it is now too late in this state to say that waste waters cannot be discharged into natural water courses." (*Id.* at pp. 28-29.) The court concluded that under the facts of that case the amount of irrigation water being discharged was reasonable and not injurious and that the lower owner could not recover damages or enjoin the upper owner for water which spread over the lower owner's property as a result of the lower owner having blocked the natural channel. The result of the blockage of the natural channel was to "pare down the rights of the upper owners. . . ." (*Id.* at p. 30.)

In *Phillips* v. *Burke* (1955) 133 Cal.App.2d 700, the lower owner, like that in *Cheesman,* destroyed the natural drainage course. The appellate court noted that the lower court "found that whatever damage if any was suffered by defendants was the result of their own acts in leveling their land, obliterating the natural watercourses and failing to provide compensating ditches of sufficient capacity." (*Id.* at p. 704.) The court observed the upper owner had the right to discharge "surface and irrigation" waters into natural water courses flowing across the lower owner's property in "reasonable and noninjurious" amounts. (*Id.* at p. 703.)

The rule we deduce from these and other authorities is that the upper owner has the right to discharge reasonable and noninjurious amounts of irrigation water through natural areas of flow onto the lower owner's property. The lower owner has a co-equal burden to receive reasonable and noninjurious amounts of irrigation water through natural flowage channels. ▮ It further appears that the construction of artificial drainage systems by the upper owner may increase the velocity though not the volume of discharge. (*Turner* v. *Hopper* (1948) 83 Cal.App.2d 215, 218 [188 P.2d 257].)

▮ The *Cheesman* and *Phillips* cases and other cases concerning irrigation and other surface water in California have long referred to the rights of the upper and lower owners in terms of the reasonableness of their conduct

in light of all of the circumstances of the particular case and not in terms of inflexible common law doctrines of liability.[2]

In the case at bench, Hughey and his predecessors by building the berm at the east end of his property in effect obliterated the natural water course by which they were bound to receive waters from above. A compensating ditch along the north border was built to receive the waters which the servient tenement had a duty to receive. Subsequently, Hughey could not "pare down" the rights of the upslope owners to discharge the waters from their properties into the compensating ditch by blocking it even in the absence of a prescriptive easement.

Moreover, the north ditch was constructed in the 1958-1959 period and the berm along the eastern border of his property was constructed sometime shortly thereafter. The record is not clear as to precisely when the berm was built but it does show it was repaired and maintained from time to time by Hughey and his predecessors. These improvements were obviously installed to receive the surface and irrigation waters from above Hughey's property, including those waters that flowed from above respondents' properties and were installed for the purpose of preventing the waters from spreading across Hughey's property in the natural drainage pattern. An inference may be reasonably drawn that respondents developed their properties relying upon the existence of these features. Under these circumstances, the court below was well within its authority in finding that it was reasonable for respondents to rely upon the existence of the ditch and berm and

---

[2] For example, in *Coombs* v. *Reynolds, supra,* 43 Cal.App. 656, a case wherein the lower owner was suing the upper owner for the unnatural discharge of water upon his property due to the leveling, cultivation and systems of drainage constructed on the upper owner's property, the court in approving an instruction to the jury referred to it as "a lucid exposition of just and equitable principles for the determination of the issues before the lower court." (*Id*. at p. 661.) The instruction referred to stated in pertinent part: " 'It is also true that one has a right to utilize the land which he owns, and if an increased flow of water, or of surface water, from his land to a lower piece of land comes from a proper use of his own land, from the cultivation of the same in a proper and useful manner, the lower land owner cannot complain of the increased flow caused by such use and ordinary cultivation or improvement of his land. It will be observed that any use of the land which is owned by the defendants herein, which might tend to increase the flow of water upon the land of the plaintiff, the mere fact that it does in some degree increase the flow does not of itself give the plaintiff the right to recover in this case, but you will have then to consider the nature of the improvements, the character of the cultivation, and determine after consideration thereof the question of damage under the general instructions as given you by the court.

" 'The right to cultivate and improve his land carries with it the right to plow the land, so that the mere fact that the defendants in this case plowed their land would not give any right of recovery to the plaintiff. I shall submit to you, however, in this case, this question, whether or not in such cultivation the defendants were guilty of such negligence, or negligent conduct, that is to say, so negligently improved their land that they caused damage by storm water, which a man of ordinary prudence might have anticipated would have been caused by such conduct.' " (*Id*. at p. 659.)

unreasonable for Hughey to block the ditch at the entrance to his property, particularly where, as the court found, the widening and deepening of the ditch between the Martinson and Pokelwaldt properties in 1981 increased the velocity but not the volume of the water being discharged into the north ditch and was not the proximate cause of any injury to Hughey.

■ In 3 Miller and Starr, Current Law of California Real Estate (1977) section 21.47, page 591, the author states the appropriate rule: "This rule [applying to discharge of water into a natural watercourse] was extended to include interference with an artificially created channel where substantial sums had been expended in reliance on the continued presence of the water-course. In other words, where the creator of an artificial watercourse intended that it be permanent, and adjoining landowners or water-users were allowed to adjust themselves to its presence and existence and to act upon the supposition of its continuation, and where this reliance could be continued for a substantial period of time, the court held that the new condition could then be regarded as natural and its artificial origin could be disregarded by the law as it had been by the community." (Fn. omitted.)

We conclude that the trial court's application of the reasonable use doctrine to the factual situation at bench was appropriate and that its conclusions are fully supported by the evidence.

II*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

The judgment is affirmed. Costs on appeal are awarded to the respondents.

Woolpert, Acting P. J., and Hamlin, J., concurred.

---

*See footnote, *ante,* page 318.