114 Cal.Rptr.2d 699 (2001)
94 Cal.App.4th 877
LOMBARD ACCEPTANCE CORPORATION, Plaintiff and Respondent,
v.
TOWN OF SAN ANSELMO, Defendant and Appellant;
Jonathan Bulkley et al., Defendants and Respondents;
Jonathan Bulkley, Plaintiff,
v.
Town Of San Anselmo et al., Defendants.
No. A094718.
Court of Appeal, First District, Division Five.
December 21, 2001.
Review Denied March 30, 2002.[*]
*700 Lepper & Harrington, Gary M. Lepper, Walnut Creek, Law Offices of Hadden W. Roth, Hadden W. Roth, San Rafael, Counsel *701 for Defendant and Appellant Town of San Anselmo.
Keegin, Talkington, Harrison & Schoppert, LLP, Jeffrey S. Schoppert, San Rafael, Paul C. Smith, Counsel for Plaintiff and Respondent Lombard Acceptance Corporation.
Flynn & Phillips, LLP, Scott M. Phillips, Counsel for Defendant and Respondent Jonathan Bulkley.
No appearance for Defendants and Respondents Henry Conversano et al.
SIMONS, J.
Defendant Town of San Anselmo (Town) appeals from an order granting a preliminary injunction against Town sought by plaintiff Lombard Acceptance Corporation (Lombard). (Code Civ. Proc., §§ 527, 904.1.) The preliminary injunction ordered Town and others (defendants Jonathan Bulkley and Henry and Mary Conversano) to pay their respective shares for the cost to "winterize" a landslide that had caused debris to flow onto Lombard's property. On appeal, Town challenges the trial court's determination that Lombard was likely to prevail on the merits of its suit against Town. We conclude the trial court applied the correct legal principles and acted within its discretion when it determined that Lombard was likely to prevail. Accordingly, we affirm the order granting the preliminary injunction.

BACKGROUND
Oak Springs Unit No. 5 is a ridge-top subdivision located in San Anselmo that is served by Oak Springs Drive, which was dedicated to Town as a public street. Oak Springs Drive deadends at the lowest point along the ridge and drains all water runoff that reaches the street into a valley gutter that traverses the end of the street. Water flowing into that gutter proceeds by gravity to one corner of the street, where it flows into another valley gutter running away from Oak Springs Drive. The first valley gutter and a portion of the second are located on Town's property. From there, water proceeds by gravity into a concrete catch-box, and then flows into a 12-inch corrugated metal pipe (pipe). The pipe is a closed system which carries the water completely across the adjoining property owned by Henry and Mary Conversano (the Conversano property), depositing the water onto a hillside within the next neighbor's property (the Bulkley property). According to Lombard, and not disputed by Town, water leaving the pipe flows downhill across the surface of the remainder of the Bulkley property and onto a portion of Lombard's property, where a 30-inch inlet carries it underground into the public drainage system.
According to Lombard's verified complaint, a landslide occurred on the Bulkley property in February 1998, causing approximately 1,000 cubic yards of mud, soil and debris, along with 200 trees, to flow onto Lombard's property. Town has not contested evidence presented through Lombard's expert that the slide was caused by water collected on Oak Springs Drive and discharged from the pipe onto the Bulkley property. Similarly, Town has not contested whether the interim harm Lombard would likely sustain upon denial of the injunction is greater than the potential harm to defendants if the injunction were granted.
Bulkley sued Town for damages resulting from the slide. Later, Lombard filed its verified complaint against Town, Bulkley and the Conversanos, along with the uphill private landowners whose houses allegedly provided water runoff onto Oak Springs Drive. Both complaints alleged causes of action against Town denominated by the parties as negligence,[1] inverse condemnation *702 and nuisance. On motion by Town, the Bulkley and Lombard cases were consolidated for all purposes under Marin County Case No. CV993346. Thereafter, Bulkley amended his complaint to add as defendants the private landowners named in the Lombard action. This appeal follows Lombard's successful motion for preliminary injunction.

DISCUSSION

I. STANDARD OF REVIEW
"We review an order granting a preliminary injunction under an abuse of discretion standard." (People ex rel Gallo v. Acuna (1997) 14 Cal.4th 1090, 1109, 60 Cal.Rptr.2d 277, 929 P.2d 596; see Cohen v. Board of Supervisors (1985) 40 Cal.3d 277, 286, 219 Cal.Rptr. 467, 707 P.2d 840.) Typically, our review is limited to a consideration whether the trial court abused its discretion in determining two interrelated factors when it decided whether to issue the preliminary injunction. "`The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued. [Citations.]' [Citations.]" (Cohen v. Board of Supervisors, supra, at p. 286, 219 Cal.Rptr. 467, 707 P.2d 840, fn. omitted.)
A court will have abused its discretion in granting or denying an injunction only when its determination "exceeds the bounds of reason or contravenes uncontradicted evidence. [Citation.]" (Jessen v. Keystone Savings & Loan Assn. (1983) 142 Cal.App.3d 454, 458, 191 Cal. Rptr. 104.) When, as here, the trial court was presented with evidence concerning the two factors but failed to make express findings as to both, we presume that the trial court found in favor of the prevailing party on both factors, and we review the record for substantial evidence to support the rulings. (14-859 Moorpark Homeowner's Assn. v. VRT Corp. (1998) 63 Cal. App.4th 1396, 1402-1403, 74 Cal.Rptr.2d 712; see also Eisenberg et al., Cal. Practice. Guide: Civil Appeals and Writs (The Rutter Group 2001) § 8:160a, p. 8-93.) "However, to the extent that the determination on the likelihood of a party's success rests on an issue of pure law not presenting factual issues to be resolved at trial, we review the determination de novo." (14-859 Moorpark Homeowner's Assn. v. VRT Corp., supra, at p. 1403, 74 Cal.Rptr.2d 712.)

II. KEYS v. ROMLEY

Because Town does not challenge the trial court's balancing of the relative harms in favor of Lombard, we consider only its ruling on the first factor: the likelihood plaintiff will prevail. Furthermore, on this issue, Town does not challenge the trial court's preliminary factual assessment in favor of Lombard. Instead, Town challenges the court's assessment of the likelihood of success based upon a pure question of law. In essence, Town asserts that Lombard can have no likelihood of success, as a matter of law, because Town did not own or control the 12-inch pipe from which the water has flowed onto the Bulkley property. We disagree. Under the seminal case of Keys v. Romley (1966) 64 Cal.2d 396, 50 Cal.Rptr. 273, 412 P.2d 529 (Keys ) an uphill landowner, who alters the natural drainage of surface waters, may be liable for the damages caused by the discharge of those waters onto adjacent property, under a reasonableness of *703 conduct test. In what appears to be a matter of first impression, we conclude that Keys applies even if the two properties are not contiguous and a key element of the artificial drainage system is neither owned nor controlled by the uphill owner. So long as that owner knowingly collects and channels the surface waters into that system and it is foreseeable that the water will discharge onto the damaged property, liability may result.
The law governing liability for property damage caused by surface waters in California derives from the Keys decision. There, the defendants owned unimproved land abutting the plaintiffs' property. The defendants did some grading and leveling of the land and built an ice rink, causing rain runoff to flow toward the plaintiffs' land. The plaintiffs also erected a commercial structure and, thereafter, removed a dirt pile from the rear of their property. Over the next several years, the plaintiffs' property was flooded by surface waters flowing from the defendants' adjoining land. (Keys, supra, 64 Cal.2d at p. 399, 50 Cal.Rptr. 273, 412 P.2d 529.) On appeal, the dispositive question was under what circumstances could the defendants be found liable for the flooding because of their use and alteration of their property.
In analyzing the question, the Supreme Court first reviewed the various rules adopted in different jurisdictions to govern liability for property damage caused by surface water. "Surface water" is defined as: "Water diffused over the surface of land or contained in depressions therein, and resulting from rain, snow, or which rises to the surface in springs.... It is thus distinguishable from water flowing in a fixed channel so as to constitute a watercourse, or water collected in an identifiable body, such as a river or lake." (Keys, supra, 64 Cal.2d at p. 400, 50 Cal.Rptr. 273, 412 P.2d 529.) The court noted that California had always followed the civil law rule, which held that "the owner of an upper, or dominant, estate is entitled to discharge surface water from his land as the water naturally flows. As a corollary to this, the upper owner is liable for any damage he causes to adjacent property by the discharge of water in an unnatural manner. In essence, each property owner's duty is to leave the natural flow of surface water undisturbed." (Id. at pp. 405-406, 50 Cal.Rptr. 273, 412 P.2d 529.) Called upon to determine whether this rule should be applied in developed urban areas, the court characterized the traditional civil law rule as "unnecessarily rigid and occasionally unjust, particularly in heavily developed areas," because it placed "the entire liability for damages on one owner on the basis of the unvarying formula that he who changes conditions is liable." (Id. at p. 407, 50 Cal.Rptr. 273, 412 P.2d 529.) The court also determined that the liability for interfering with surface waters is best resolved under tort principles, rather than under property law principles. (Id. at pp. 407-08, 50 Cal.Rptr. 273, 412 P.2d 529.)[2]
Ultimately the court concluded that a modified civil law rule should be applied in both urban and rural areas. The court noted that "[N]o rule can be applied by a court of justice with utter disregard for the peculiar facts and circumstances of the parties and properties involved. No party, whether an upper or a lower landowner, may act arbitrarily and unreasonably in his relations with other landowners and still be immunized from all liability. [¶] It is therefore incumbent upon every person to take reasonable care in using his property *704 to avoid injury to adjacent property through the flow of surface waters. Failure to exercise reasonable care may result in liability by an upper to a lower landowner. It is equally the duty of any person threatened with injury to his property by the flow of surface waters to take reasonable precautions to avoid or reduce any actual or potential injury. [¶] If the actions of both the upper and lower landowners are reasonable, necessary, and generally in accord with the foregoing, then the injury must necessarily be borne by the upper landowner who changes a natural system of drainage, in accordance with our traditional civil law rule. [¶] In the total spectrum of American case law, California may be considered a devotee of a modified civil law rule. Our rule has the advantage of predictability, in that responsibility for diversion of surface waters is fixed, all things being relatively equal. On the other hand, we cannot permit certainty of liability to be an excuse for tolerating unreasonable conduct by any landowners in modern society, whether they be upper or lower, urban or rural. Consistent and wise application of the California rule encourages profitable and enjoyable use of property, and provides a basis for mutual resolution of problems caused by errant surface waters. [¶] We reiterate that the question is not one of strict negligence accountability, although we agree generally with [the superceded] Court of Appeal opinion in this case [citation] that `an owner should not escape liability when he is negligent.' The question is reasonableness of conduct." (Keys, supra, 64 Cal.2d at pp. 408-409, 50 Cal.Rptr. 273, 412 P.2d 529.)
The court determined that "[t]he issue of reasonableness becomes a question of fact to be determined in each case upon a consideration of all the relevant circumstances, including such factors as the amount of harm caused, the foreseeability of the harm which results, the purpose or motive with which the possessor acted, and all other relevant matter." (Keys, supra, 64 Cal.2d at p. 410, 50 Cal.Rptr. 273, 412 P.2d 529, citing Armstrong v. Francis Corporation (1956) 20 N.J. 320 [120 A.2d 4, 10].) "If the weight is on the side of him who alters the natural watercourse, then he has acted reasonably and without liability; if the harm to the lower landowner is unreasonably severe, then the economic costs incident to the expulsion of surface waters must be borne by the upper owner whose development caused the damage. If the facts should indicate both parties conducted themselves reasonably, then courts are bound by our well-settled civil law rule." (Keys, supra, at p. 410, 50 Cal.Rptr. 273, 412 P.2d 529.)
Subsequent appellate cases have summarized the rules laid down in Keys as follows: "`1. If the upper owner is reasonable and the lower owner unreasonable, the upper owner wins; 2. If the upper owner is unreasonable and the lower owner reasonable, the lower owner wins; and 3. If both the upper and lower owner are reasonable, the lower owner wins also.'" (Gdowski v. Louie (2000) 84 Cal.App.4th 1395, 1404, 101 Cal.Rptr.2d 609, quoting Burrows v. State of California (1968) 260 Cal.App.2d 29, 32-33, 66 Cal.Rptr. 868, italics as added by Gdowski omitted.)

III. APPLICATION OF KEYS v. ROMLEY TO NONCONTIGUOUS PROPERTIES
In Keys, the plaintiffs and the defendants owned abutting properties. Here, the damaged properties are not contiguous with Town's, and Town's surface water caused the damage only after its discharge through the pipe. Neither fact precludes the application of Keys. First, we do not read the reasonable use rule adopted in Keys as limited solely to contiguous lots. The word "adjacent," used in Keys, is itself susceptible to a broader meaning. According to Webster's Collegiate Dictionary (10th ed.2000) page 14, the *705 primary definition of "adjacent" is "la: not distant: nearby...." (See also 1 Oxford English Diet. (2d ed.1989) p. 155 ["1. Lying near or close (to).... (Not necessarily touching, though this is by no means precluded.)" (Italics in original.) ].) Thus, the term adjacent may or may not imply contact. If the Supreme Court had intended its decision solely to apply to property owners whose properties were contiguous, there are several other common words that the court could have chosen to convey such intent, for example "adjoining," "abutting," or "contiguous" itself. Indeed, we note that the court used the words "adjoining" and "abutting" throughout the Keys decision when describing the facts in that and other cases (Keys, supra 64 Cal.2d at pp. 398, 399, 401, 402, 405, 407, 50 Cal.Rptr. 273, 412 P.2d 529), yet elected to use the word "adjacent" when articulating its analytical framework (id. at pp. 405, 409, 50 Cal.Rptr. 273, 412 P.2d 529). The court's choice of language is significant. If the court had meant to limit its decision to disputes between contiguous landowners, we have no doubt it would have said so.
In addition, one of the cases relied upon by the Supreme Court in Keys, Armstrong v. Francis Corporation, involved a dispute over redirection of surface waters by an uphill developer whose subdivision does not appear on our review to have been contiguous with the plaintiffs parcel there. In Armstrong, the uphill developer collected and redirected surface water drainage to a corrugated pipe system that later emptied into a stream abutting the plaintiffs property. (120 A.2d at p. 6.) Thus, the Supreme Court was fully cognizant when it considered the Keys case that surface water disputes could arise involving property damage to parcels distant from the water's point of origin or aggregation.
Finally, immunizing an uphill property owner from application of the reasonable use rule solely because the damaged property is not abutting would be incompatible with the flexibility sought by Keys. The court criticized earlier analytical structures used for surface water disputes as having been "unnecessarily rigid." (Keys, supra, 64 Cal.2d at p. 407, 50 Cal.Rptr. 273, 412 P.2d 529.) The reasonableness standard imposed by Keys, however, created questions of fact "to be determined in each case upon a consideration of all the relevant circumstances...." (Id. at p. 410, 50 Cal. Rptr. 273, 412 P.2d 529, italics added.) Furthermore, since Keys was decided, its standard has been extended to other kinds of water damage disputes, including those between noncontiguous property owners. (See Locklin v. City of Lafayette (1994) 7 Cal.4th 327, 337, 27 Cal.Rptr.2d 613, 867 P.2d 724 (Locklin) [reasonable use rule applied to discharge of surface waters into a natural watercourse]; Ektelon v. City of San Diego (1988) 200 Cal.App.3d 804, 808, 810, 246 Cal.Rptr. 483 [the rule of reasonableness applied to flood control improvements in a watercourse]; Martinson v. Hughey (1988) 199 Cal.App.3d 318, 328, 244 Cal.Rptr. 795 [reasonable use rule applied to discharge of irrigation water onto lower agricultural land].) Consistent with Keys, we believe that Town's relative proximity to any downhill property damage constitutes just one fact to be considered among all other pertinent facts in the overall assessment of the reasonableness of conduct of the parties involved.
Town does not argue to the contrary; it concedes liability can attach to nonabutting property owners. Instead, it contends that Keys is inapplicable because the damage in this case did not result from alteration of the natural condition of its property, but from the transportation of the water in the pipe: "Town's belief in Keys [sic] inapplicability is based on the intervention of mechanisms, not the happenstance of artificial boundaries." It argues *706 its lack of ownership or control over that pipe precludes liability. Again, we disagree.
First, we note that ownership and control of the pipe would be critical questions in an inverse condemnation claim.[3] However, these property law concepts played no role in the tort analysis adopted by Keys to resolve disputes concerning surface water damage, and are of little aid in our own analysis.
Second, the immunity sought by Town is inconsistent with recent developments in the law regarding surface water damage. In Keys, an uphill property was improved, altering the natural drainage of surface waters onto an adjacent lot. In Locklin, the Supreme Court considered a variant of the facts in Keys. Public entities owned streets, drainage systems and other water-impervious improvements. Surface waters were discharged therefrom into a natural watercourse causing an increased flow of streamwater which damaged plaintiffs' downstream properties.[4] Under the natural watercourse rule, an upstream property owner who altered the natural drainage, channeling surface waters into a natural watercourse, was immune from any resulting damage to property downstream. (Locklin, supra, 7 Cal.4th at p. 344, 27 Cal.Rptr.2d 613, 867 P.2d 724.) The defendants in Locklin relied on this historic rule and argued that "extraordinary liability" would result if the court set it aside. (Id. at p. 352, 27 Cal.Rptr.2d 613, 867 P.2d 724.) The Supreme Court, however, held that a rule that distinguishes between the discharge of surface waters directly onto another owner's property and the discharge into a natural waterway that ultimately results in identical damage would be unjustified. It rejected the public entities' request for "absolute immunity for the discharge of surface water runoff into a natural watercourse whether or not they have reduced or eliminated the capacity of the ground to absorb normal rainfall, channeled the runoff into a single destructive outlet, or otherwise altered the volume and velocity of the waters discharged into the watercourse, and regardless of whether the watercourse is capable of carrying the increased flow of waters." (Id. at 353, 27 Cal.Rptr.2d 613, 867 P.2d 724) The court then imposed the Keys reasonable use test when surface waters channeled into a waterway damaged downstream property.[5]
*707 In sum, under existing precedent, the reasonable use test applies when surface waters are discharged directly onto adjacent land (Keys), or indirectly onto noncontiguous land via a watercourse (Locklin).[6] Town presents no principled reason for refusing to apply the same rule when surface waters are drained from an uphill parcel, like Oak Spring Drive, and the flow is channeled into an artificial conduit, like the pipe, from which it is discharged, causing damage on noncontiguous land.
It bears emphasizing that the reasonableness of conduct test is not one of strict liability. Though it will not provide Town with an absolute right to discharge surface water in a manner that damages distant downhill property, the rule requires consideration of all pertinent facts and anticipates that the owners of the uphill and the damaged properties, as well as those who own property in between, will act reasonably with respect to the flow of surface waters. If all, in fact, do so, then the uphill owner who uses or alters the property in a manner which affects the discharge of surface waters onto a neighbor's land, contiguous or not, is liable.
Town contends that there is no evidence that it was aware that the pipe was an element of the system draining its surface water. We find this contention unavailing; substantial evidence of its knowledge is found in a series of written communications from Town's engineer to the developer of the Oak Springs subdivision, Laster & Company, during the construction of the project. In a letter dated May 21, 1965, the need for a corrugated pipe was first raised. The letter specified that storm waters should be directed to the natural runoff channels. It then stated "catch basins should be provided at the curb ends and erosion protection provided part way down the slopes, either by a concrete lined ditch or half round corrugated metal pipe." Three months later, the engineer wrote again expressing concern that the drainage system be completed before the fall rains began. In October, the engineer wrote, confirming that inspections of the drainage work were occurring and that "work is progressing toward the installation of the necessary drainage structures." On November 19, 1965, the engineer expressed concern that the drainage ditches had insufficient capacity for high intensity rainfall. "It is believed these ditches should have at least three times their present capacity. It would appear less expensive to install catch basins at the end of both streets and [12-inch corrugated metal pipe] down the slopes to velocity breaking structures, as suggested verbally." (Italics added.) In several subsequent letters the engineer complained that the drainage system was still inadequate, and failed to meet city standards. As late as October and November 1970, the engineer was addressing the need to improve drainage to direct the surface water "to the bottom of the canyon." "Due to the recent rains, it is suggested the work of paving the terrace, completing the drain, installing the conduit to the bottom of the canyon ... be completed immediately." (Letter dated Oct. 22, 1970, italics added.) "Reference is made to my letter dated October 22, 1970 ...[¶] In this letter I mentioned the necessity to complete the paving of the terrace and completing the drain including *708 conduit to the bottom of the canyon." (Letter dated Nov. 10, 1970, italics added.)
Town argues vigorously that these letters, properly interpreted, do not demonstrate an implied acceptance of the pipe by it. Whatever the merits of this contention, we find the letters to be substantial evidence that contemporaneous with its acceptance of Oak Springs Drive, Town was aware that the water runoff that reaches the street and drains into the valley gutter would eventually drain into a pipe and be carried down the hillside. Further, it was foreseeable that the surface water would be discharged onto the damaged property below. These conclusions are reinforced by the fact that the sole function of the pipe was to drain the surface water that collected on and flowed from Oak Springs Drive.
Thus, we conclude Town is not immune from liability under Keys, though it neither owned nor controlled the pipe. We further conclude that the trial court properly applied the reasonableness of conduct test. It considered whether Town had acted reasonably in its management of the surface water runoff from its street. It evaluated the evidence to assess whether the downhill property owners had acted reasonably with regard to the runoff. The court concluded Town was not permitted to ignore blithely what happened to the water once it left Town's property. Finally, no party has directed our attention to any claim in the trial court that the pipe was negligently designed, constructed or maintained, or in any fashion failed in its purpose. Having determined that the damage did not result from unreasonable conduct by any of the involved property owners, the trial court properly concluded that Lombard was likely to succeed on the merits of its reasonableness of conduct claim. Under Keys, if all property owners are found reasonable in their conduct, then the uphill owner who uses or alters the property in a manner which affects the discharge of surface waters to its benefit is liable for damage resulting from water redirected from its property.[7]

DISPOSITION
The order granting the preliminary injunction is affirmed. Respondents shall recover their costs for this appeal.
We concur: JONES, P.J., and STEVENS, J.
NOTES
[*] In denying review, the Supreme Court ordered that the opinion be not officially published. (See California Rules of CourtRules 976 and 977).
[1] In fact, case law defining the liability for an uphill landowner who diverts the natural flow of water clarifies that traditional negligence principles do not apply. (See part II of the Discussion entitled Keys v. Romley, infra.)
[2] The Keys rule "attempts to determine the rights of the parties by an assessment of all the relevant factors. The key point of departure from the [earlier] rules is that the reasonable use rule treats the issue of surface waters as a question of tort law instead of property law." (6 Miller & Starr, California Real Estate (3d. ed.2000) § 14.21, com., p. 52.)
[3] See, for example, DiMartino v. City of Orinda (2000) 80 Cal.App.4th 329, 338, 95 Cal. Rptr.2d 16, where the appellate court found no evidence that the city was involved in the construction, design, supervision of construction or maintenance of the underground pipe, or was even aware of the pipe. Thus, inverse condemnation liability could not be imposed.
[4] A natural watercourse "`is a channel with defined bed and banks made and habitually used by water passing down as a collected body or stream in those seasons of the year and at those times when the streams in the region are accustomed to flow. It is wholly different from a swale, hollow, or depression through which may pass surface waters in time of storm not collected into a defined stream.'" (Locklin, supra, 7 Cal.4th at p. 345, 27 Cal.Rptr.2d 613, 867 P.2d 724, quoting San Gabriel Valley Country Club v. Los Angeles County (1920) 182 Cal. 392, 397, 188 P. 554.)
[5] One difference in the application of the reasonable use test in Locklin from that in Keys relates to the result required when all relevant parties have acted reasonably. The civil law rule modified in Keys imposed liability whenever the uphill owner altered the natural flow of surface waters and damaged adjacent property. After Keys, if all parties acted reasonably, the uphill owner was liable. The natural watercourse rule changed by Locklin, however, provided immunity when an upstream owner's alteration of the flow of surface water into a natural watercourse damaged downstream property. After Locklin, if all parties acted reasonably, the downstream owner could not recover for its damage. (Locklin, supra, 7 Cal.4th at pp. 360-361, 27 Cal.Rptr.2d 613, 867 P.2d 724.)
[6] Town raises a third situation: When alterations to an uphill property lead to a discharge of surface water onto nonadjacent property, because the "natural topography allows [the] water to entirely circumvent contiguous property." Town concedes that the Keys analysis would apply in these circumstances, confirming the wisdom of applying it in the instant case.
[7] Because we conclude Lombard was entitled to injunctive relief on its claim for unreasonable diversion of surface waters, we need not review whether Lombard was also entitled to injunctive relief based upon its additional claims for inverse condemnation and nuisance.